STATE of Tennessee, Plaintiff-Appellee,

v.

Willie CLAYBROOK,
Defendant-Appellant.

Supreme Court of Tennessee,
at Jackson.

Sept. 8, 1987.

David M. Livingston, Bolivar, Garry G. Brown, Alamo, for defendant-appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Ann Lacy Johns, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

BROCK, Justice.

In the trial court the defendant was convicted of murder in the first degree and was sentenced to death by electrocution. The death sentence was based on aggravating circumstances found by the jury as set out in T.C.A. Section 39–2–203(i)(2), (5) and (7), that is, that he had been convicted of a previous violent felony, that the instant murder was heinous, atrocious, and cruel and that the murder was committed during commission of a robbery.

At about 10:30 a.m. on Saturday, September 17, 1983 the body of Mr. Lesley Jennings was found by his great grandchild lying on the floor of the kitchen-dining room area of his home on Highway 88 near Maury City in Crockett County. Blood was observed on a sheet used to cover the couch in the living room, on the wall and ceiling and Mr. Jennings' badly beaten head lay in a pool of blood. His pants' pockets had been turned inside out.

A pathologist stated that the cause of Mr. Jennings' death was blunt trauma to his head. There were wounds all about his head from at least 16 identifiable blows and he had suffered at least 12 fractures of the skull. Floor burns on Mr. Jennings' face and extensive crushing of the back of the skull indicated that some blows had been inflicted while he was lying on the floor.

Although the pathologist was unable to identify the precise type of instrument used in the beating, the patterns of the wounds suggested that the weapon had "a flat circular face which was probably closed and not open." Obviously, that description could include a claw hammer or a solid piece of pipe.

Although the house was not ransacked, a heater had been pulled loose from the wall in the bathroom and someone had removed the fuses from the fuse box and cut off the electricity. Although Mr. Jennings did not smoke, the butt of a Winston cigarette was found in the toilet bowl. A hammer that was usually kept on the front porch was not there. Law enforcement officers were unable to pick up any latent fingerprints from objects in the house nor did they find any footprints or tracks to indicate that someone fled from the house through the surrounding fields.

### STATE'S PROOF

The State's evidence showed that on the morning of September 17 the defendant went to the bank in Gates, Tennessee and was told that his account balance was zero. Cecil Houk testified that between 7:00 and 8:00 a.m. he saw the defendant driving a tan or beige truck west on Highway 88 toward Gates. Around 9:00 a.m. he saw the defendant sitting in this truck at a house about one mile from Mr. Jennings' home. Around 10:00 a.m. Houk saw the same truck parked at Jennings' house.

Sometime between 8:00 and 10:00 a.m. Henry Lee King drove by Jennings' house and saw a man wearing a light blue work shirt, whom he identified as the defendant, walking toward Jennings who was sitting on the front porch. A light tan colored Ford pickup was parked in the driveway. Both Mr. Jennings and the defendant waived at King. When King drove by an hour later he saw the truck was gone and that the car of Mr. Jennings' grand daughter-in-law was pulling out of the driveway.

Later that day sometime after Noon Mr. Houk and Mr. King, on separate occasions and at different places, saw the defendant driving by in his truck. King noticed that

the defendant was now wearing a different, darker colored shirt and that someone was with him. Having learned by this time of Mr. Jennings' death, Mr. Houk and King got the license number of the truck which was traced by police to the defendant who lived in Lauderdale County, Tennessee.

Alerted to be on the lookout for defendant, Deputy Sheriff Jerry Crane apprehended the defendant just as he was driving his brown Ford pickup truck into his driveway in Lauderdale County. The defendant started to run, then turned and came back to meet Deputy Crane. Upon being informed that he was being held for investigation of a homicide, the defendant said that he had done nothing. At that time, the defendant was wearing a dark blue pullover T-shirt. While he was being transported to meet the sheriff of Crockett County, the defendant told the officers that he had been to Jackson that day and stopped in Crockett County. When he spoke with the sheriff, however, he denied being in Crockett County that day.

The officers noticed red specks on the defendant's trousers and the defendant tried to scratch off the specks. The defendant claimed he had won the trousers in a crap game the night before. The officers also noticed red spots or ketchup-like stains on the driver's side of the truck's front seat. Later that evening, on a return visit to defendant's home, law enforcement officials confiscated a dark shirt that appeared to have been recently washed.

Later, the defendant gave a statement to TBI agent, Thomas L. Lewis. In it he said that he had taken his mother to a dialysis clinic in Jackson early on the morning of September 17 and that while his mother was receiving treatment he went to the bank at Gates at about 9:00 a.m. to check his account in order to learn if he had enough money to buy a tape player. He then stopped by Jennings' house to talk. The two had been chatting on the front porch for 30 minutes when a black man wearing an army camouflaged coat came from behind the garage and asked for some water. After Mr. Jennings took the man inside the house, the defendant heard

scuffling and upon entering the house saw the man hitting Mr. Jennings with a piece of pipe. Defendant told the man not to do that, whereupon, the man, carrying the pipe, ran out the front door and behind the garage. Defendant stated that he did not report the killing because he was frightened. He left Mr. Jennings' house at 10:00 a.m. and returned to Jackson where he picked up his mother at about Noon.

On the next day, the defendant asked a deputy at the Crockett County jail to buy him some Winston cigarettes. While getting the money out of the defendant's billfold, the deputy found a dollar bill which appeared to have blood on it. The deputy noted that the defendant always smoked Winstons while he was in the jail.

On September 29, 1983 two girls found Mr. Jennings' billfold lying in some bushes off the Lonon Road on Highway 88 two miles west of Alamo. The billfold contained two $2.00 bills, Mr. Jennings' driver's license and his bank book.

A TBI serologist testified that there were spots of blood on the shoes that the defendant had been wearing when he was arrested. Human blood stains were found on the pockets and lower legs of the defendant's trousers, on the front of seat cover of the defendant's truck and on the dollar bill found by the deputy. Other items submitted for testing such as the defendant's shirt showed no trace of blood.

### DEFENDANT'S PROOF

Defendant's evidence showed that early on that Saturday morning he had driven his mother to a clinic in Jackson for dialysis treatment and several hours later at about Noon he had returned to pick her up. His mother testified that on the drive home from the clinic the clot in the skin graft through which she received dialysis treatment "broke loose" and began bleeding in the truck. Blood dripped on the upper leg of defendant's pants, and on his shoes in the truck floor. Mrs. Claybrook contradicted her son's story about how he had recently won the pants. She testified that he had owned them for a long time. Claybrook's father, who had talked with Mr. Jennings

about coming to the Claybrook's church testified that he had told his son to stop by Mr. Jennings' home to ask him about going to their church the next Sunday. Roger Turnage testified that he saw Mr. Jennings and "another boy" resembling the defendant sitting on Mr. Jennings' front porch sometime between 9:00 and 10:00 a.m. that Saturday morning. Defendant waved at Mr. Turnage.

## SENTENCING HEARING

The State presented evidence that the defendant had pled guilty to second degree murder in Lauderdale County Circuit Court on September 17, 1973. The defendant's elderly father and mother, as well as several of his acquaintances, testified on his behalf. His parents explained that they had adopted him at the age of 3 months. Defendant's witnesses, some of whom admitted that he had been in trouble before, stated that the defendant who was in his 30's was a good son, who helped his parents and was an honest man. They told of his involvement in the church as a part-time preacher, a deacon and clerk.

## SUFFICIENCY OF THE EVIDENCE

Although the evidence in the record is circumstantial we are satisfied that it is sufficient to support the verdict under the standards of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and of TRAP Rule 13(e).

## JURY SELECTION

The defendant argues strenuously that extensive pre-trial publicity concerning details of this murder as well as the defendant's prior conviction of second degree murder and a recent acquittal of another charge of first degree murder required that the voir dire examination of prospective jurors should have been conducted individually and outside the hearing of prospective jurors and jurors who had been tentatively selected. That extensive pre-trial publicity concerning these other crimes had in fact occurred was established by affidavits that are in the record and by newspaper articles from *The Crockett*

*Times* and *The Jackson Sun.* While the articles in the *Times* do not appear to be harmful, most of those from *The Jackson Sun* do mention that the defendant had previously been convicted of second degree murder and had been charged but acquitted of another murder in the first degree.

Despite our recent decisions in *State v. Simon*, Tenn., 635 S.W.2d 498, 506 (1982) and *Sommerville v. State*, Tenn., 521 S.W.2d 792, 797 (1975), the trial judge summarily overruled the defendant's pre-trial request for individual voir dire of jurors. It appears that the total consideration given by the trial court to the defendant's pre-trial motion for individual voir dire was as follows:

The Court: Motion to individual voir dire is overruled.

Mr. Livingston: Your Honor, if it please the court may I address that before you overrule it?

The Court: No.

Later at trial when it appeared that about 80% of the first group of prospective jurors had heard something about the case on trial, the trial judge again refused individual voir dire of the jury as to each prospective juror's knowledge of the case, particularly as to the defendant's prior conviction of murder. As a result of defense counsel's questioning, two members of this initial panel mentioned in the presence of other potential jurors that they had heard that the defendant had been in prison before. The following appears in the record:

Mr. Livingston: Your Honor, may we approach the bench? I'm going to get into an area that I need to address the court with.

The Court: All right.

Whereupon, a bench conference was held on the record in the presence of the jury but out of the hearing of the jury and the following proceedings had:

Mr. Livingston: Several of the jurors have acknowledged that they have previously read of this case. I am now going to attempt to go into voir dire as to what they have read and I feel like if it comes out, if anyone says that he

has been convicted or previously tried, it will taint the entire panel. I don't know....

The Court: It may not do it but if you open that up, I'll just have to make that decision when the time comes. I doubt that I would excuse the entire panel if the fact that you deliberately bring that up.

Mr. Livingston: Well, your Honor, we know the press coverage. I don't need to go over that.

The Court: All right.

(Said bench conference having been completed, the following proceedings were had in the presence and hearing of the jury.)

Mr. Livingston: Your Honor, if it please the court those members that have a knowledge that they either read of this case or have prior knowledge, could I individually voir dire those out of the presence of the jurors that have acknowledged that they have not read or have no prior knowledge?

The Court: No Sir.

Attorney for the defendant then asked prospective jurors concerning their prior knowledge about the case, common gossip, newspaper publications, radio broadcasts, etc.

It appears that nine of the first twelve prospective jurors admitted they had prior knowledge of the case, that they had either heard about or read newspaper accounts of the crime. At approximately this point in the proceedings the trial judge directed counsel to approach the bench for a conference in which the following occurred:

The Court: Do you understand the proper way to get at this?

Mr. Livingston: No Sir.

The Court: All right. You can ask them if they have either formed or expressed an opinion. If they say that they haven't then that's it. If they say they have, then you will have to ask them whether or not they can set that opinion aside and listen to the evidence—set everything else aside, and if they can't do that, then you can properly challenge for cause but you can't under the line of questions that you are asking. Understand?

Mr. Livingston: Yes Sir.

The Court: Right now, you are hanging him. Do you understand that?

Mr. Livingston: Yes Sir.

The Court: All right.

Although at least 80% of the prospective jurors had heard something about this case, all of them said that they could dismiss that from their minds in considering a verdict.

■ At the hearing on a motion for a new trial, ten of the twelve chosen jurors were questioned about their knowledge of the defendant's prior criminal activity when they deliberated on his guilt or innocence. Three of them stated that they knew of his prior conviction or trouble with the law and we note that these three were the last three jurors chosen and were chosen *after the defendant had exhausted all his peremptory challenges.* Seven of the jurors, including three who heard the other jurors mention his prior conviction, stated that they knew nothing. All testified that there was no discussion of his prior record during their guilt deliberations. There can be no doubt, however, that the defendant was denied that full and searching voir dire of prospective jurors necessary to enable him to elicit grounds for challenges for cause, *see, e.g.* Rule 24, Tennessee Rules of Criminal Procedure, and to make informed decisions in the exercise of his peremptory challenges.

Rule 24, Tennessee Rules of Criminal Procedure, sets out the procedure to be followed in voir dire of prospective jurors. In pertinent part that rule provides:

(a) Examination— ... The court may put to the respective jurors appropriate questions regarding their qualifications to serve as jurors in the case, *and shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges.* The court, upon motion of a party or on its own motion, may direct that any portion of the questioning of a

prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors. (Emphasis added.)

This Court, speaking through Mr. Justice Fones in *Sommerville v. State*, Tenn., 521 S.W.2d 792, 797 (1975), clearly laid down the rule to be thereafter followed by trial judges in this situation, as follows:

Further, with respect to the method of examination, whenever there is believed to be a significant possibility that a juror has knowledge of the jury verdict at a prior trial, or has been exposed to other potentially prejudicial material, the examination of each juror, with respect to his exposure, shall take place outside the presence of other chosen and prospective jurors. An accurate record of such examinations shall be kept by the court reporter. These rules shall be given prospective application only.

The foregoing rule was expressly affirmed by this Court in *State v. Simon, supra,* at 506. The necessity that this rule be followed in all criminal cases is obvious; but, it is imperative when the defendant is on trial for his life.

■ In every criminal case the defendant is entitled to have his guilt or innocence determined by impartial and unbiased jurors who have not been subjected to the influence of inadmissible and prejudicial information such as knowledge that the defendant has been convicted or accused of other crimes, especially of crimes substantially similar to that for which he is standing trial. The above-quoted *Sommerville* rule is calculated to guarantee that right of the defendant to trial by a fair and unbiased jury.

This Court cannot sanction the denial of the procedure required by *Sommerville* in a death penalty case such as this; so-called curative instructions and admonitions to the jurors who are subjected to prejudicial information by reason of the trial judge's failure to follow the *Sommerville* procedure are not enough. The procedure set out in *Sommerville* is easy to follow and certainly is much more effective to ensure the selection of fair and unbiased jurors than the procedure followed by the trial judge in this case.

The trial judge erred in denying individual voir dire of the jurors under the circumstances disclosed in this record. In our opinion, the need to invoke the *Sommerville* procedure for voir dire was triggered when it was made known to the trial court that 80% of the first group of prospective jurors had heard information regarding the defendant's case, two members of that initial panel mentioned in the presence of other prospective jurors that they had heard that the defendant had been in prison before.

Moreover, we think that the defendant has shown that this error was not harmless but, indeed, was prejudicial to his rights.

As evidence of his contention that the failure of the trial judge to allow individual voir dire of the jurors was prejudicial the defendant cites the following examination which occurred when defendant's attorney examined jurors in the presence of other veniremen as follows:

Mr. Livingston: Do you know anything about this man's background before September—

Russell Cook: Well, I understand he has been in prison before. Other than that, I don't know anything but just what I have read and heard and other people talking.

Mr. Livingston: I challenge for cause.

The Court: Overruled.

Mr. Livingston: Do you know what he was supposedly in prison for?

Russell Cook: I don't know what he has done before. I just know he was in prison.

Mr. Livingston: Mrs. Davis I think you said that you did or did not know anything about this case.

Rebecca Davis: What I heard and what I read in the paper.

Mr. Livingston: What have you read in the paper 'Mam?

Rebecca Davis: I don't know if I read it or if I heard it that he had been in prison for murder before he committed this one, if he committed it.

Mr. Livingston: I challenge for cause. The Court: Overruled.

Thus, the defendant contends that the trial judge's refusal to allow individual and separate voir dire of jurors prejudiced him in that he was unable to discover what information was within the knowledge of each individual juror without risking the exposure of all other potential jurors to prejudicial information and was deprived of his Sixth Amendment right to a fair trial as secured by the Fourteenth Amendment and by the State constitution.

Thus, at the hearing on the motion for a new trial three of the jurors who determined his fate stated that they had known about his prior conviction and trouble with the law. Moreover, these three jurors were chosen after the defendant had exhausted all his peremptory challenges. In addition, we conclude that the failure of the trial judge to follow the explicit instructions of *Sommerville* with respect to voir dire of jurors amounts to prejudice to the judicial process as set out in Rule 36(b), Tennessee Rules of Appellate Procedure. *State v. Onidas*, Tenn., 635 S.W.2d 516 (1982). Trial judges cannot be permitted to ignore or disregard the explicit directives of this Court set out in *Sommerville, supra.*

## FAILURE TO SUPPRESS PHYSICAL EVIDENCE

Defendant contends that his clothing, money and the seat cover taken from his truck should not have been admitted into evidence because they were obtained by police as a result of an illegal arrest, search and seizure. At the pre-trial suppression hearing the evidence indicates that witnesses Houk and King each reported to Sheriff Klyce of Crockett County a pickup truck stopped at the victim's house on the morning of the killing and gave a description of that truck to the Sheriff; later these same two witnesses called to the Sheriff and reported that they had seen the same vehicle a second time shortly after the killing and had written down the license number of the truck which they gave to the Sheriff. A computer search for that number revealed that it was issued for a truck in Lauderdale County owned by defendant Willie Claybrook. The Lauderdale County Sheriff's Department was then advised that a brown Ford pickup truck bearing the license number issued to the defendant was wanted, along with defendant Claybrook for investigation of a homicide in Crockett County. Lauderdale County deputy, Crane, who was personally acquainted with the defendant, was driving near defendant's home where he lived with his father, when he saw the truck turning off the highway and into the driveway. Deputy Crane pulled into the driveway behind the truck at which time the defendant alighted from the truck and ran a short distance away then stopped and approached Deputy Crane. The defendant asked what was wrong and Deputy Crane replied that he had orders to hold the defendant and his truck for Crockett County in the investigation of a homicide. At this point Claybrook was "patted down" and transported to Gates, Tennessee, where Sheriff Klyce got into the rear seat of the patrol car with the defendant and "read him his rights." While Claybrook was being transferred to the Sheriff's car officers first observed blood stains on his pants and questioned him about them.

Defendant was then driven back to his home by the officers who testified that defendant's father, who owned the property, gave the officers permission to search the premises. Deputy Crane and Sheriff Klyce both testified that they happened to see "a red substance" on the driver's side of the defendant's pickup truck when they looked through the window. They testified that neither of them opened the door of the truck or entered it and that nothing was removed from it. The apparent reason for their returning with the defendant to his home was to examine the area where Claybrook had run a short distance upon first being accosted in the driveway by Deputy Crane.

When the defendant was taken back to the Crockett County jail, officers took his blood-stained trousers and shoes and locked his wallet away as was customary in

their booking procedure. That night after receiving a written consent from the defendant to search his truck, TBI Agent Lewis returned to the Claybrook home and examined the truck. Upon discovering red spots on the seat, Lewis seized the vehicle and had it towed back to Crockett County for processing in the daylight. On Monday, September 19, a formal arrest warrant was obtained for the defendant.

The defendant contradicted the foregoing testimony of the officers, stating that Deputy Crane had treated him roughly and that he was never advised of his *Miranda* rights and that the officers had in fact searched his truck and taken several items from it when they first returned to his home. He further claimed that when Agent Lewis obtained his written consent to search his truck on Saturday night that Lewis told him that if he didn't consent to the search, Lewis would have the truck towed in. Defendant's father also denied he gave the officers permission to search his property.

■ There is evidence to support the theory of the State which was accredited by the trial court. Upon the facts thus found, we conclude that the arrest, the search, and the seizure were valid, so that, the evidence thereby obtained was admissible. The defendant having been identified by witnesses as present at the home of the victim at or about the time of the killing, and the discovery of what appeared to be blood stains on the defendant's pants' legs gave the officers probable cause to make the arrest. *Compare State v. Melson,* Tenn., 638 S.W.2d 342, 350–51 (1982). The observation by Sheriff Klyce and Deputy Crane of a "red substance" on the seat of the defendant's truck while they were on the premises with the permission of defendant's father did not result from a search. *State v. Byerley,* Tenn., 635 S.W.2d 511 (1982). The record also supports the State's contention that the defendant freely gave Agent Lewis written permission to search his truck.

## ADMISSIBILITY OF
## DEFENDANT'S STATEMENT

The defendant argues that the trial court should have suppressed the statements he gave to Sheriff Klyce, District Attorney General Peebles, and TBI Agent Lewis because some of the questioning was done after he had requested an attorney and he also argues that the statements were the fruit of an illegal arrest which we have hereinabove discussed.

The defendant's version of the circumstances and conditions surrounding the questioning of the defendant differs considerably from the version given by the State. The trial judge has accredited the State's version and, there being evidence to support that version, we are bound to accept it as true.

Thus, there is evidence that after having informed the defendant of his rights, Sheriff Klyce noticed blood on defendant's pants and questioned him about it. The defendant told him that he had won the pants in a crap game. Later on the way from defendant's home to the Crockett County jail, the defendant for the first time requested to see an attorney. According to the State's witnesses the questioning of the defendant ceased at that point although the defendant insists that he asked for an attorney and the questioning continued. When the defendant arrived at the jail, District Attorney General Peebles asked him if he had been convicted of murder in another county. The defendant informed him that he wanted to see a lawyer before answering, and General Peebles instructed everyone including Agent Lewis not to ask the defendant any more questions. Lewis then processed the defendant by taking his personal history, etc. The defendant asked what kind of trouble he was in and asked what was going to happen to him. Agent Lewis told him that it appeared that he would be charged with armed robbery and first degree murder.

On his way back to his cell from the processing, the defendant saw District Attorney Peebles and asked to speak with him. The defendant had been told that Peebles was the prosecutor and the District Attorney General. Defendant's insistence is that he thought that Peebles was a pri-

vate attorney who would help him. When Peebles said that he could not talk to the defendant because he had requested an attorney, the defendant said "I don't want you questioning me. I want to talk to you." General Peebles' testimony is that he assumed that the defendant wanted to discuss his treatment in the jail and that he, therefore, went into a back room with the defendant where the defendant asked why he had been arrested. Peebles told the defendant why he had been arrested and the defendant suddenly "bubbled forth" his story about seeing someone else commit the murder. Defendant said he wanted to tell what happened and offered to give a statement to Agent Lewis. Lewis advised the defendant of his rights and obtained a written waiver, whereupon he proceeded to take the defendant's statement.

■ The State's insistence is that since the defendant initiated any questioning or dialogue concerning the case with the law enforcement personnel after his request for counsel, his rights were not violated under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In our opinion, the evidence supports the insistence of the State that defendant's rights were not violated at the taking of his statement.

■ In further support of his argument that his statement was illegally obtained, the defendant cites T.C.A. Section 40-7-106(b) which requires that an arrested person be permitted one phone call "without delay" before he is booked. Defendant states that he was not allowed this phone call when he requested it, but Sheriff Klyce testified that the defendant made a call "on Saturday afternoon we put him in" jail possibly after he gave his statement to Lewis. The defendant had not previously asked to make a phone call. It thus appears that the letter of the statute was not complied with in this case, but that failure does not require that the defendant's statement be suppressed. The failure to afford to a defendant the phone call required by this statute is but one factor to be considered in determining the voluntariness of the defendant's statement and whether the conduct of the officers has overcome the will of the accused. Automatic suppression of the statement is not called for. Our conclusion is that the failure to give the defendant the phone call as prescribed did not render his statement to Agent Lewis involuntary.

## VALIDITY OF THE DEATH PENALTY STATUTE

■ The defendant attacks the constitutionality of the death penalty statute on several grounds all of which have either been previously rejected by a majority of the Court or are not applicable upon the facts of this case. Perhaps one ground requires discussion, that is, that Section 39-2-203(i)(5) setting forth the aggravating circumstance that the murder was especially heinous, atrocious or cruel is unconstitutionally vague. This case was tried before our decision in *State v. Williams,* Tenn., 690 S.W.2d 517 (1985) was announced. Thus, the trial judge did not define the abstract terms set out in the statute as required by *Williams.* But, as in *State v. Duncan,* Tenn., 698 S.W.2d 63 (1985) the omission here does not require a new sentencing hearing because (1) defense counsel made no request for defining instructions and did not object to the instructions as given and (2) the proof here does support the aggravating circumstance as defined in *Williams* and (3) the two additional aggravating circumstances found by the jury are fully supported by the proof. We find no error in this regard.[1]

Defendant has asserted several other alleged errors and we have considered them all but find no prejudicial error. The trial court did not err in denying defendant's motion for a change of venue because the record does not reveal that "undue excitement" against the defendant was shown. Tennessee Rules of Criminal Procedure, Rule 21(a). In this connection, however,

1. Respecting the constitutionality of the death penalty, members of the court continue to ad-

here to their views expressed in *State v. Dicks,* Tenn., 615 S.W.2d 126, 132 (1981).

we note that it was shown that at least 80% of the prospective jurors had been exposed to some sort of pre-trial publicity regarding this case or that they possessed knowledge of this case and that the defendant did use all fifteen of his peremptory challenges. These facts do not make out a case for a change of venue but, in our opinion, do buttress our conclusion that the trial court erred in failing to grant individual voir dire of prospective jurors.

There was no error committed by the trial court in allowing a six-year-old great grandson of the victim to testify concerning his discovery of his great grandfather on the morning of the murder. The trial judge's examination of young Christopher left something to be desired under our authorities, but has not prejudiced the defendant since the witness' testimony in no way implicated the defendant. Moreover, his testimony was substantially the same as that of his mother and a neighbor who also discovered the body.

We certainly agree with the defendant's insistence that the trial judge erred in failing to state his reasons for denying defendant's motion to suppress, *see* Rule 12(e), Tennessee Rules of Criminal Procedure; *State v. Raspberry*, Tenn.Crim.App., 640 S.W.2d 227, 229 (1982), but we cannot say that this error affected the judgment.

The failure of the trial judge to instruct that the sentence of the jury would in fact be carried out was not error. *State v. Melson*, Tenn., 638 S.W.2d 342, 366–67 (1982).

Defendant further insists that since it is improper to exclude veniremen simply because they are opposed to the death penalty, questions concerning their opinions on the death penalty are irrelevant and prejudicially focus the jurors' attention on the death penalty prior to the determination of guilt. Additionally the defendant argues that group voir dire on this issue made his jury "death prone." We find no error. *State v. McKay*, Tenn., 680 S.W.2d 447, 450, 453–55 (1984); *State v. Workman*, Tenn., 667 S.W.2d 44, 49 (1984).

The defendant moved that the District Attorney General Peebles and his office be recused because General Peebles testified at pre-trial hearing on the motions to suppress regarding conversations with the defendant at the jail on the day of his arrest. The motion was denied. A similar issue arose in *United States v. Johnston*, 690 F.2d 638 (7th Cir.1982). There, an Assistant United States Attorney was allowed to testify at a new suppression hearing upon remand. His ability to continue as prosecutor at trial was permissible, there being no reasonable likelihood of his being called as a witness at that trial. The court held:

> As a general rule the government prosecutor is not to be automatically disqualified as a witness or as trial advocate after testifying at a pre-trial suppression hearing, but testifying and continuation as counsel shall be subject to the sound discretion of the trial judge.... *Ibid.* at 646.

The position thus stated is consistent with our own rule stated in *State v. Caruthers*, Tenn., 676 S.W.2d 935, 940 (1984) that whether a prosecuting attorney should testify is discretionary with the trial judge. We find no abuse of discretion in the instant case.

There was no error in admitting the opinion testimony of a pathologist that the murder weapon was "consistent with a flat base of a hammer ... or the end of a pipe which had been sealed or closed." Defendant's argument that this opinion should have been excluded from evidence because it was not made known to him pursuant to a motion for discovery prior to trial under Tennessee Rules of Criminal Procedure, Rule 16(a)(1)(D), is not valid. That rule provides only that the defendant be allowed to inspect and copy "any results or reports of physical or mental examinations, and of scientific tests" within the control of the State, material to the preparation of the defense or intended to be used as evidence-in-chief at trial. That rule was not violated here.

We find no error in the alleged improper argument by the prosecuting attorney. The argument objected to was pure speculation and in no way prejudicial to the defendant's case.

In this charge on first degree murder, the trial judge stated:

> For you to find the defendant guilty of murder in the first degree, the State must have proven beyond a reasonable doubt:
>
> \*　\*　\*　\*　\*　\*
>
> (2) That the killing was malicious; that is, that the defendant was in the state of mind to do the alleged wrongfully act without legal justification or excuse. If it is shown beyond a reasonable doubt that the alleged victim was killed, the killing may be *inferred* to be malicious; however, this inference may be rebutted by either direct or circumstantial evidence, or by both. (Emphasis supplied.)

Defendant insists that this charge unconstitutionally shifted the burden of proof to him on the issue of malice, under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We find no error. The word "inference" or "inferred" is not burden-shifting. *State v. Bolin*, Tenn., 678 S.W.2d 40 (1984). Moreover, if such an error appeared in this case it would have to be harmless because of the overwhelming proof of mindless, malicious viciousness displayed by the repeated bludgeoning of the head of the deceased Jennings.

By reason of the error of the trial court in denying separate, individual voir dire of prospective jurors out of the presence and hearing of other prospective and tentatively selected jurors, we reverse the judgment and sentence herein and remand for a new trial. Costs of this appeal are taxed against the State.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.