STATE of Tennessee, Appellee,

v.

Sidney PORTERFIELD and Gaile K.
Owens, Appellants.

Supreme Court of Tennessee,
at Jackson.

Jan. 19, 1988.

Rehearing Denied Feb. 29, 1988.

Certiorari Denied May 16, 1988.
See 108 S.Ct. 1756.

W. Mark Ward, Asst. Shelby County Public Defender, Memphis, for Sidney Porterfield.

Brett Stein, James O. Marty, Memphis, for Gaile K. Owens.

W.J. Michael Cody, Atty. Gen. & Reporter, Norma Crippen Ballard, Asst. Atty. Gen., Nashville, for the State.

## OPINION

COOPER, Justice.

This is a direct appeal from the sentences of death imposed on the defendants, Sidney Porterfield and Gaile K. Owens, for the killing of Mrs. Owens' husband, Ronald Owens. The defendant, Sidney Porterfield was convicted of murder in the first degree. The defendant, Gaile K. Owens, was

convicted of accessory before the fact, to wit: murder in the first degree.

The defendants question the sufficiency of the evidence, rulings by the trial court on pre-trial motions, on *voir dire*, the admission of evidence, the argument to the jury by the state, and the court's instructions to the jury. The defendants also insist that the sentencing provisions of the Tennessee Death Penalty Act, T.C.A. § 39–2–203, are unconstitutional.

After consideration of the several issues and of the entire record, we are of the opinion that no reversible error was committed in either the guilt or sentencing phase of the trial, that the verdicts and sentences are sustained by the evidence, and that the sentences of death under the circumstances of this case are in no way arbitrary or disproportionate. *See State v. Harbison,* 704 S.W.2d 314 (Tenn.1986); *State v. Austin,* 618 S.W.2d 738 (Tenn. 1981); *State v. Groseclose,* 615 S.W.2d 142 (Tenn.1981).

There is little controversy concerning the material facts. The evidence shows that over a period of months, Mrs. Owens solicited several men to kill her husband. One of these men was Sidney Porterfield. She met with him on at least three occasions, the last being at 2:30 p.m. on Sunday, February 17, 1985. At that time, she told him that her husband would either be home alone that night or would be at the church playing basketball.

That evening Mr. and Mrs. Owens and their two sons attended evening church services. Afterwards, when Mr. Owens remained at church to play basketball, the boys asked, as they usually did, to stay with their father. Mrs. Owens refused their request and took them to a restaurant for dinner and then to the home of Mrs. Owens' sister, where they stayed until approximately 10:30 p.m. When they arrived home at about 11:00 p.m. Mr. Owens' automobile was in the driveway. The doors were open, the interior light was on and Mr. Owens' coat and tie were on the seat. They found the back door to the house partially open, and the keys in the lock. There were signs of a struggle in the kitch-en and blood was splattered on the wall and floor. Mr. Owens was found in the den unconscious, his head covered with blood. Mr. Owens died some six hours later from multiple blows to his head.

The autopsy revealed that Mr. Owens had been struck at least twenty-one times with a blunt instrument, described by the forensic pathologist as a long, striated cylinder such as a tire iron. The blows had driven his face into the floor, crushed his skull and driven bone fragments into his brain. Mr. Owens also had sustained extensive injuries to his hands and strands of hair between his fingers indicated he had been covering his head with his hands when he was beaten.

After the killing, George James, one of the men solicited by Mrs. Owens to kill her husband, contacted the police and told them of Mrs. Owens' offer. James then assisted the police by permitting them to record telephone conversations he had with Mrs. Owens. After one of the calls, James met Mrs. Owens in the Raleigh Springs Mall in Memphis. James was wearing a hidden body microphone, which was being monitored by police in a nearby automobile. Mrs. Owens paid James sixty dollars to keep quiet, telling him that it was all the money she had. She also stated that she had had her husband killed because of "bad marital problems." Mrs. Owens was placed under arrest at the conclusion of her meeting with Mr. James.

At first, Mrs. Owens claimed that she only had hired people to follow her husband and "to rough him up." She did admit paying out some $4,000 to $5,000 to various men for expenses. Later she confessed to offering three men $5,000 to $10,000 to kill her husband and to talking with a man known as "little Johnny" at 2:30 p.m. on the day of the murder about killing her husband. She had promised to pay him three or four days after the murder. When asked why, Mrs. Owens stated, "[W]e've just had a bad marriage over the years, and I just felt like he had, mentally I just felt like he had been cruel to me. There was very little physical violence."

The man who met Mrs. Owens on Sunday afternoon was identified by witnesses as Sidney Porterfield. A witness also placed Mr. Porterfield in the vicinity of the Owens' house a week before the killing.

Mr. Porterfield also made a statement to the police which was entered into evidence. According to Mr. Porterfield, he met with Mrs. Owens on three occasions to discuss plans for the killing of Mr. Owens, the last being at 2:30 p.m. on Sunday, February 17, 1985. He stated that Mrs. Owens offered him $17,000 to kill her husband, and that he told her he would have to check out the situation. (Shortly after her husband's funeral Mrs. Owens had asked her father-in law for $17,000 "to pay some bills.") He further stated that he went to the Owens' house that evening at about 9:00 p.m. On leaving his automobile, he put a tire iron in his pocket in case he encountered a dog. Porterfield stated he was walking in the back yard of the Owens' house when Mr. Owens came home; that Mr. Owens would not accept his explanation that he was looking for a house, but informed him he was going to hold him until the police arrived; that Mr. Owens grabbed him by the arm and attempted to pull him into the house. According to Porterfield, Mr. Owens had a brief case in one hand and was grasping Porterfield with the other. (No attempt was made to explain how Mr. Owens, with his hands thus occupied, unlocked the door to the house.) Porterfield said he tried to break away and, when he was unsuccessful, struck Mr. Owens with the tire iron. The men were then in the kitchen. Mr. Owens threw his hand up for protection, but would not release Mr. Porterfield. Porterfield then continued to strike Mr. Owens with the tire iron, with the result that he did extensive damage to both of Mr. Owens' hands and to his head. On leaving the Owens' house. Mr. Porterfield threw the tire iron and the gloves he was wearing into a dumpster. They were never recovered.

Defendant Porterfield offered no evidence in his defense. Mrs. Owens presented the testimony of a neighbor, who testified that Mrs. Owens was almost hysterical after her husband was found. A funeral home employee also testified. He stated that a large balance was owing on Mr. Owens' funeral bill, presumably to show that Mrs. Owens did have large debts to pay after her husband's death as she had represented to her father-in-law in attempting to secure a loan.

Mr. Porterfield insists that the trial court erred in admitting codefendant Owens' out-of-court confession into evidence. Mr. Porterfield argues that the recitals in Owens' statement that she would have the money to pay Porterfield three to four days after the murder, that Porterfield told her "he had never been able to catch up with him [Mr. Owens]" and nothing had ever been right, and that she did give Porterfield a key to the house did not "interlock" with defendant Porterfield's confession, and their admission into evidence was a violation of the rule set forth in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In *Bruton v. United States, supra,* the court held that an inculpatory confession of a non-testifying codefendant should not have been admitted in a joint trial with the defendant, who had not confessed his participation in the crime. In *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed. 2d 713 (1979), a plurality of the United States Supreme Court held that admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments. Following this decision, this court held that where confessions of jointly tried codefendants are similar in material aspects there is no violation of the *Bruton* rule. But, where the confession of one nontestifying codefendant contradicts, repudiates or adds to material statements in the confession of the other nontestifying codefendant so as to expose him to an increased risk of conviction or an increase in the degree of the offense with correspondingly greater punishment, *Bruton* is violated. *See, e.g., State v. King*, 718 S.W. 2d 241, 247 (Tenn.1986); *State v. Elliott*, 524 S.W.2d 473, 477–478 (Tenn.1975).

Recently, however, the United States Supreme Court abandoned the reasoning of the plurality in *Parker* regarding interlocking confessions and held in *Cruz v. New York*, —— U.S. ——, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), that where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant and even if the defendant's own confession is admitted against him. However, the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient "indicia of reliability" to be directly admissible against him (assuming the "unavailability" of the codefendant) despite the lack of opportunity for cross-examination and may be considered on appeal in assessing whether any Confrontation Clause violation was harmless. *See Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). This rule was an adoption of Justice Blackmun's concurring opinion in *Parker v. Randolph*, that the *Bruton* error in that case was harmless. 99 S.Ct. at 2141–2143.

It was error, therefore, to admit Owens' unredacted confession. Nonetheless, under the facts of the case, in light of the overwhelming evidence of guilt, considering only Porterfield's confession and the evidence of the other witnesses and the circumstances of the murder, the *Bruton* error was harmless.

While not raising a *Bruton* issue, Mrs. Owens insists she was prejudiced by having to try her case with that of Mr. Porterfield as it prevented her from pleading guilty and taking a proffered life sentence. The record reveals that the state indicated to defense counsel that it would recommend life sentences for both defendants if both defendants would plead guilty. There was no offer to one defendant to the exclusion of the other. In short, even if the cases had been severed, Mrs. Owens would have had to stand trial and would have been subject to the imposition of the death penalty if the jury found the evidence sufficient. The trial court's denial of a severance under these circumstances was not an abuse of discretion. *Peabody v. State*, 556 S.W.2d 547, 550 (Tenn.Crim.App. 1977); *Seaton v. State*, 4 Tenn.Crim.App. 452, 472 S.W.2d 905, 906 (1971).

In a separate action, both defendants moved to have their cases severed, insisting that the denial of a severance interfered with their use of peremptory challenges. A motion for severance is addressed to the discretion of the trial court and its decision will not be reversed absent a showing of prejudice to the defendants. *State v. Coleman*, 619 S.W.2d 112, 116 (Tenn.1984). Rule 8(c)(1) of the Tennessee Rules of Criminal Procedure provides that defendants shall be mandatorily joined for trial where, as here, "each of the defendants is charged with accountability for each offense included."

The record shows that counsel for defendants were permitted to collaborate and confer with each other in the exercise of peremptory challenges so as not to duplicate their challenges and thereby reduce the effective number of peremptory challenges available to each. As to the argument, that one defendant on occasion would exclude a juror satisfactory to the other defendant, we see no prejudice in this action. The jury selection procedures are designed to insure the selection of a fair and impartial jury, not to enable the accused to select particular jurors. *State v. Simon*, 635 S.W.2d 498, 508 (Tenn.1982). There is nothing in the record to indicate that the jury finally selected was not an impartial and unbiased jury.

The defendants also raise a number of issues with relation to the *voir dire*. Specifically, they insist that the trial judge erred in denying their motions for individual, sequestered *voir dire*, that he unduly limited the questioning of prospective jurors with respect to exposure to pre-trial publicity, and that he improperly excused for cause prospective juror, Charlayne Picket. The defendants also insist that the trial court erred in refusing to grant a

mistrial, when several prospective jurors overheard a newsreporter's story on trial proceedings, and when two jurors made prejudicial remarks during *voir dire*. Further, the defendant Porterfield charges the state with using their peremptory challenges to systematically exclude blacks from the jury. We have carefully considered each of these contentions and found them to be without merit. The ultimate goal of a *voir dire* is to see that the jurors are competent, unbiased, and impartial. On reading the *voir dire* in this case, we are impressed with the fact that the counsel attained this goal. We are further of the opinion that no prejudicial error was committed by the trial court in its numerous rulings during *voir dire*.

■ The basis for the request for individual *voir dire* was the fear that prospective jurors had been exposed to and remembered newspaper, television, and radio reports of the crime for which the defendants were being tried. Where a crime is highly publicized, the better procedure is to grant the defendants individual, sequestered, *voir dire*. However, it is only where there is a "significant possibility" that a juror has been exposed to potentially prejudicial material that individual *voir dire* is mandated. *State v. Claybrook,* 736 S.W.2d 95 (Tenn.1987); *Sommerville v. State,* 521 S.W.2d 792, 797 (Tenn.1975).

■ In the instant case, the trial judge questioned prospective jurors as to their knowledge of the case from either having discussed it in their neighborhood, or having read it in the newspaper, or having heard it on the radio or television. Most of the prospective jurors who had been exposed to some type of pre-trial publicity responded that they only vaguely recalled what they had read or heard. Many did not recall anything they had read or heard. The trial court also inquired of every prospective juror exposed to pre-trial publicity, whether they could set aside their recollection and render a decision based only upon the evidence presented at trial. Five prospective jurors stated they could not and were excused by the court for cause. During this questioning of prospective jurors

on pre-trial publicity, the court was careful to see that nothing inflammatory or prejudicial to the defendants was revealed. And, the answers of the jurors actually seated in the case do not give any indication that the jurors remembered the pre-trial publicity in any detail or that they were prejudiced or biased against the defendants, or either of them, as a result of the pre-trial publicity. Under these circumstances, we see no abuse of discretion in the trial court denying individual, sequestered *voir dire,* nor any prejudice resulting to the defendants because of his ruling.

■ Exception also was taken by the defendants to the exclusion of a prospective juror, Charlayne Pickett, for cause. The substance of Ms. Pickett's statements on *voir dire* was that she would automatically vote not to impose the death penalty in this or any other case regardless of the law and evidence. This disqualified her as a juror, and the trial court correctly excused her for cause. *See Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985)

■ During the *voir dire,* defendants moved for a mistrial when (1) one prospective juror in answer to defense counsel's question of why he could not consider life as punishment for first degree murder stated that there was only a certain amount of time that a person serving a life term would stay "in there" and that something had to be done about existing crime; and (2) when a juror indicated that his wife had told him about the case and that he knew "what went down" and that "there is a case." Both jurors were peremptorily challenged and were excused by the court. We see no prejudicial error resulting from these remarks. The first prospective juror was merely responding to defense counsel's question as to why he would refuse a life sentence. The second never revealed what he knew about the case, and the trial court admonished him, and any prospective jurors within hearing, that anything they had learned about the case prior to trial could not be used as evidence in the juror's deliberations. Further, the defendants have failed to demonstrate that the jury

which heard the case was prejudiced or biased by the statements of the two prospective jurors. The comments did not in any way affect the presumption of innocence or in any way lessen the burden of the state to prove its case.

■ During the *voir dire*, it was discovered that a newsreporter had called in a report of the court proceedings using a pay telephone located outside the courtroom, and that several prospective jurors were nearby. The report had to do with a statement of defense counsel that some news agencies were reporting that Mrs. Owens had plead guilty to the charges against her. Counsel agreed at the time that to eliminate any possibility of prejudice, the trial court would ask potential jurors whether they had overheard any conversation concerning the case and admonish them that any news report was not evidence. When it developed that several prospective jurors had overheard the reporter's telephone call (none indicating they had heard anything specific), defendants moved for a mistrial or in the alternative a new jury panel. The court denied the motion, but did grant defendants individual *voir dire* on this incident. Of those questioned individually on this issue, none had overheard anything prejudicial or even substantial. It follows that the trial court did not commit prejudicial error in denying defendants' motion for a mistrial.

■ The defendant Porterfield insists that the blacks were underrepresented on the panels of prospective jurors and that this was due to the systematic exclusion of blacks in the jury selection process. He further charged that the trial judge erred in refusing an offer of proof on the issue. While systematic exclusion is charged in this court, it was not the basis of the objection to the jury panel in the trial court. However, whenever a defendant in an identifiable class raises the specter of discrimination in the selection of prospective jurors, he should be given the opportunity to develop his charges. However, from the record before us, no prejudice resulted to Mr. Porterfield from the rulings by the trial court in this area. The

jury as finally selected consisted of two black males, five white males and five white females. The state had four unused peremptory challenges, and could have excluded the two black males from the jury had their goal been the exclusion of blacks.

In the bifurcated sentencing hearing, the forensic pathologist again testified for the state concerning the circumstances of Mr. Owens' death, such as blood being inhaled, bone fragments being driven into his brain, and the fact that Mr. Owens had lived six hours after the beating. Two photographs showing the head wounds suffered by Mr. Owens also were introduced.

In addition, the state presented proof that Mr. Porterfield had been convicted of robbery with a deadly weapon in 1968 and of simple robbery twice in 1971. The state also relied on the circumstances of the killing as shown by evidence in the guilt phase of the trial.

In mitigation, the defendant Owens presented evidence that she had been treated by a psychiatrist on one occasion in 1978 for severe behavorial problems. She also called two jail employees who testified that Mrs. Owens was a good prisoner who caused no problems, volunteered to work, and attended Bible study classes. Mr. Porterfield presented no evidence in mitigation.

In imposing the sentence of death, the jury found three aggravating circumstances with respect to Porterfield, and two with respect to Mrs. Owens. No mitigating circumstances were found. Specifically, the jury found that Mr. Porterfield (1) had been previously convicted of one or more felonies involving the use or threat of violence to the person; (2) that he committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration, or the promise of remuneration; and (3) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. *See* T.C.A. §§ 39-2-203(i)(2), (4) and (5). The jury found the same aggravating circumstances in sentencing Mrs. Owens, except for the finding

of previous conviction of a felony involving the use or threat of violence to the person.

■ Defendant Porterfield challenges the sufficiency of the evidence as to the jury's findings in the sentencing hearing. He points out that the earlier convictions shown were that of Sydney Porterfield, Jr., and argues that there is no evidence to show that he and Sydney Porterfield, Jr. are the same person. On this issue, the record shows that a fingerprint technician from the Shelby County Sheriff's Department testified that the defendant's thumbprint matched the thumbprint of the person convicted under the name of Sydney Porterfield, Jr. The jury was justified in our opinion in accepting this testimony and in concluding that the defendant and Sydney Porterfield, Jr. are the same person.

■ Defendant Porterfield also insists that there is insufficient evidence to show that the murder was for remuneration or the promise of remuneration, or to show that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. As to the first contention, the statement Mr. Porterfield gave to the police describing his meeting with Mrs. Owens and the purpose of the meeting was sufficient for the jury to find that the murder was for remuneration or the promise of remuneration. As to the latter insistence, there is evidence that Mr. Porterfield hit Mr. Owens with a tire iron at least twenty-one times, causing several fractures to the skull, to facial bones, and to Mr. Owens' hands. Several of the blows to the head were inflicted when Mr. Owens was on the floor and attempting to shield his head by his hands. In our opinion, the evidence is sufficient to support the jury's conclusion that the murder of Mr. Owens in the fashion described was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. *See State v. McNish,* 727 S.W.2d 490, 494 (Tenn.1987); *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985).

While not directly challenging the sufficiency of the evidence on which the jury predicated the sentence of death, Mrs. Owens does insist that the trial court erred in not allowing her to show that she had filed a motion asking the court to allow her to plead guilty and accept the sentence of life proffered by the state. The state had indicated that it would accept such a plea, conditioned upon both defendants pleading guilty. The state withdrew the offer when Mr. Porterfield declined to plead. Mrs. Owens wanted to show these negotiations to the jury as a mitigating circumstance.

In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the United States Supreme Court held that the

> Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

98 S.Ct. at 2965. The Court emphasizes, however, in a footnote to this sentence that,

> [n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.

■ This court has held that evidence is relevant to the punishment only if it is relevant to a statutory aggravating circumstance or to a mitigating factor raised by the defendant. *Cozzolino v. State,* 584 S.W.2d 765, 768 (Tenn.1979). Evidence regarding Mrs. Owen's interest in accepting a plea bargaining offer is not relevant to either the issue of punishment or to any mitigating factor raised by the defendant, and was in our opinion properly excluded.

■ Both defendants insist that the trial court erred in permitting the introduction of two photographs at the sentencing hearing to show the nature and extent of the injuries inflicted upon the victim. The defendants insist that the photographs were without any probative value and that the prejudicial effect of the photographs mandates a reversal of the defendants' con-

victions. We see no merit in this argument. It is well-settled that the admissibility of photographs is a matter committed to the sound discretion of the trial judge, whose ruling will not be overturned on appeal absent a clear showing of abuse of discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). The photographs in question were relevant to proving one of the statutory aggravated circumstances—that is, whether the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. While undoubtedly prejudicial to the defendants, in the sentencing stage of the proceedings and in view of the aggravating circumstance alleged, they were highly probative of the nature and extent of the injuries inflicted upon Mr. Owens. While every death by beating is not as a matter of law to be included within the category of "especially heinous, atrocious, or cruel ...," the infliction of heavy, repeated, and vicious blows to a helpless, conscious victim may easily be found by a trier of fact to fall in that category. *See State v. McNish* 727 S.W.2d 490 (Tenn.1987).

The defendants argue that the photographs were inadmissible because of the state's assurances during *voir dire* and during the guilt phase of the trial that it would not seek to introduce the morgue photographs. Defendants insist that was an oral stipulation, which caused them to alter their *voir dire* of the jury. We find nothing in the record to support this argument of the defendants. The fact that the state stated it would not introduce the morgue pictures in the guilt phase of the trial was not a commitment that the pictures would not be offered to the jury in the sentencing phase, where they were relevant to proof of an aggravating circumstance.

The defendants insist that the state erred in failing to give the required notice of the aggravating circumstances it intended to rely upon in the sentencing phase of the trial. The record shows that throughout their preparation for trial, the defendants knew that the state would seek the death penalty. However, notice of the aggravating circumstances the state intended to prove was not given the defendants until the day the trial began. Rule 12.3(b) of the Tennessee Rules of Criminal Procedure provides that the state shall give notice both of its intent to seek the death penalty and notice of the aggravating circumstances not less than thirty days prior to trial. It further provides that "if notice is filed later than this time [30 days], the trial judge shall grant the defendant upon his motion a reasonable continuance of the trial." The defendants sought no continuance in this case. By failing to move for a continuance, the defendants waived the time requirement for the giving of notice. We note further that there is nothing in the record to indicate either that the defendants were surprised when the state announced the aggravating circumstances it intended to prove, or that the defendants were prejudiced in any way by the timing of the notice.

Defendant Porterfield also raised the specter of prosecutorial misconduct during the closing argument in the sentencing phase of the trial. We have read carefully the argument and are of the opinion that the argument was pertinent to the issues and was predicated upon evidence presented during the trial.

There are several issues directed to the instructions given by the trial court to the jury in the sentencing stage of the trial. In his first complaint, Mr. Porterfield insists that the trial court erred in instructing the jury that they must not allow sympathy or prejudice to influence them in reaching their verdict. We see no error in this instruction. In *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the United States Supreme Court held that an instruction informing the jury that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial did not violate the Eighth or Fourteenth Amendments. *Id.* at 840. According to the Court a reasonable juror would interpret the instruction "as a directive to ignore only the sort of sympathy that

would be totally divorced from the evidence adduced during the penalty phase." *Id.*

He also insists that the trial judge erred in failing to define "torture" or "depravity of mind" for the jury and erred in its definitions of the terms "heinous," "atrocious," and "cruel." It would have been better had the trial judge used the definitions set out in *State v. Williams,* 690 S.W.2d 517, 532, 533 (Tenn.1985), as they have been approved by this court. However, the definitions given were in our opinion adequate. Further, we find no prejudicial error in the trial court's failure to define the terms "torture" or "depravity of mind." The evidence in this case supports the aggravating circumstance, Tenn. Code Ann., § 39–2–203(i)(5), as defined in *State v. Williams, supra,* as the defendant repeatedly struck the victim with a tire iron, inflicting horrible head wounds. Furthermore, the remaining two aggravating circumstances were correctly charged and are supported by the evidence. Under these circumstances there was no prejudice to the defendant by the failure of the trial judge to define "torture" or "depravity of mind." *State v. King,* 718 S.W.2d 241 (Tenn.1986); *State v. Duncan,* 698 S.W.2d 63, 70–71 (Tenn.1985).

Further, Mr. Porterfield insists that the trial court committed reversible error in failing to tell the jury that they were not to consider the defendant's silence as evidence against him in the sentencing phase of the trial. The record shows that the defendant did not request this instruction. Absent such a request, the failure of the trial judge to charge on the constitutional right of the defendant not to give testimony is not error. *See Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 112, 67 L.Ed. 2d 241 (1981); *Rowan v. State,* 212 Tenn. 224, 369 S.W.2d 543 (1963).

Mr. Porterfield also charges that the trial judge failed to instruct the jury on the quantum of proof required for the imposition of the death penalty. We find no error in this part of the court's instructions. The trial judge charged verbatim the Tennessee Pattern Jury Instruction, T.P.I.—Crim. 20.-03, formulated for use at the sentencing

hearing in a capital case, which contains the statutory language of T.C.A. § 39–2–203(g), and it is in our opinion a sufficient and correct charge.

Mr. Porterfield also argues that the jury instructions could be interpreted as mandating the death penalty. The instruction questioned is in the language of T.C.A. § 39–2–203(g), which this court has previously held does not create a mandatory death penalty. *See State v. Teague,* 680 S.W.2d 785, 790 (Tenn.1984).

Finally, it is argued that the trial judge committed error in failing to instruct the jury to presume that the defendant would actually serve a life sentence, if that were the jury's verdict. A similar argument has been made in other cases and found to be without merit. *State v. Melson,* 638 S.W. 2d 342 (Tenn.1982); *Houston v. State,* 593 S.W.2d 267, 278 (Tenn.1979).

The defendants also question the constitutionality of the Tennessee Death Penalty Act. They concede the issue is being raised only to preserve it for later review and acknowledge that this court has repeatedly upheld the constitutionality of T.C.A. § 39–2–203 and the constitutionality of death sentences imposed under the statute. *See State v. Melson,* 638 S.W.2d 342, 367–368 (Tenn.1982); *State v. Strouth,* 620 S.W.2d 467, 470 (Tenn.1981); *Houston v. State,* 593 S.W.2d 267 (Tenn.1980). In doing so, this court has pointed out that "there is nothing in either the state or federal constitution, historically or otherwise, which precludes the imposition of the death penalty in accordance with the procedures and under the circumstances provided for in the present statutes of this state." *State v. Austin,* 618 S.W.2d 738, 741 (Tenn. 1981).

While conceding the constitutionality of the Tennessee Death Penalty Act, defendant Porterfield does take the position that the Act is discriminatorily applied in that "the death penalty is disproportionately imposed upon black citizens who have allegedly killed white citizens." There is nothing in the record to support this assertion— no statistical studies, or data, or other evidence. Further, if the defendant is to pre-

vail under the Equal Protection Clause of the Constitution of the United States, it is incumbent upon Mr. Porterfield to show that the jury "acted with discriminatory purpose" in his case. *See McCleskey v. Kemp,* 481 U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). This has not been done. In fact, it is not even argued.

All assignments of error are overruled. The judgment of conviction in each case and the sentence imposed pursuant thereto are affirmed. The sentences will be carried out as provided by law on April 15, 1988, unless otherwise stayed or modified by appropriate authority. Costs are taxed to appellants.

HARBISON, C.J., and FONES, DROWOTA and O'BRIEN, JJ., concur.

### OPINION ON PETITION TO REHEAR

Defendant–Appellant, Gaile K. Owens, has filed a petition to rehear which has been considered by the court and found to be without merit.

The petition is denied. Costs are adjudged against petitioner.