IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 2, 2004 Session

# STATE OF TENNESSEE v. STEPHEN LYNN HUGUELEY

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 6665     Jon Kerry Blackwood, Judge**

---

**No. W2004-00057-CCA-R3-CD  - Filed March 17, 2005**

---

A Hardeman County jury found the defendant, Stephen Lynn Hugueley, guilty of first degree premeditated murder.  Following a separate penalty phase, the jury found the presence of four statutory aggravating circumstances and that these aggravators outweighed any mitigating factors. The jury subsequently imposed a sentence of death.  On appeal, the defendant seeks review by this Court of both his conviction for first degree murder and his sentence of death.  He presents the following issues for review: (1) whether the trial court erred in denying the defendant an individual and sequestered voir dire; (2) whether the trial court erred in denying the defendant's objection to the State's use of peremptory challenges based upon race and gender; (3) whether the trial court erred in denying the defendant's motion to excuse a potential juror for cause; (4) whether the indictment failed to charge a capital offense; and (5) whether the trial court failed to apply meaningful standards to ensure constitutionally adequate proportionality review.  Finding no error, we affirm the defendant's conviction of first degree murder and sentence of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MℓLIN, J., delivered the opinion of the court, in which, JERRY L. SMITH and ROBERT W. WEDEMEYER. JJ., joined.

F. Michie Gibson, Jr. and T.J. Cross-Jones, Nashville, Tennessee, for the appellant, Stephen Lynn Hugueley.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michael Markham, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; Terry D. Dycus, and Colin Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Guilt Phase Evidence*

The following evidence was presented against the defendant.  On January 17, 2002, Delbert

Steed, a correctional counselor at the Hardeman County Correctional Facility, entered "F" pod to counsel inmates. At that same time, the defendant also entered the pod, approached the table where Steed was sitting, and stabbed Steed in the back. As Steed fell to the floor, the defendant continued stabbing him. Mary Harris, a correction officer working on pod control, called a Code One, requesting assistance. Officer Perry, the pod officer, opened the pod door and told the defendant to stop. Upon hearing her command, the defendant "raised up, [and came] to her with the knife drawn back like he was going to stab her, so Harris shut the door." The defendant then returned to stabbing Steed. Officer Donald Watkins then entered the pod and ordered the defendant to drop his weapon. In response, the defendant "stabbed one, maybe two more times [until the] handle broke on the knife; then he stopped." Finally, the defendant complied with Officer Watkin's order and dropped to the floor. By this time, other officers and medical personnel had arrived. After surveying the area, Officer Watkins observed a pillowcase on the floor that appeared to have something inside it. He also noticed that the weapon used to stab Steed remained lodged in his back, but the weapon's handle lay near the shower wall.

Joseph Vernon, an internal affairs investigator with the Tennessee Department of Correction, was contacted as a result of the incident. By the time Investigator Vernon arrived at the scene, Steed's body had been removed to the infirmary. However, at the crime scene, Investigator Vernon observed that the weapon removed from Steed's body was a quarter-inch rod that had been sharpened to a very fine point on one end and was almost eleven (11) inches long. Also, the pillowcase observed at the scene was actually a torn piece of a sheet that had "D cell" batteries in one end. Investigator Vernon further observed that the area of KF Pod was roped off. Investigator Vernon noted that KF Pod consisted of two (2) levels, with cells on both levels. The defendant was assigned to Cell 206 on the second level, which was approximately forty-two (42) feet from Cell 206 to where Steed was sitting in the day room.

Don Dunaway, an internal affairs investigator with the Department of Correction, was contacted to interview the defendant at Riverbend Maximum Security Institution later that day. Before conducting the interview, Investigator Dunaway had the defendant acknowledge his rights and sign a waiver form, documenting his willingness to talk. In his statement, the defendant admitted that he and Steed had never gotten along. The following colloquy occurred:

DD: What . . . what did he do to you? What . . . what'd he do to make you not like him?
SH: Well, this goes back . . . see, you have to go back before I got to Hardeman County.
DD: Okay!
SH: They put me off over at South Central. Well, South Central . . . now . . . I don't belong to any gang-affiliation or anything like that. But I believe that people . . . you know, a white woman should go with a white man . . . .
. . . .
SH: I don't believe in inter-racial relationships. And I was very vocal about it. Well, a bunch of black gang members that was gettin' drugs brought in by the

-2-

women guards there . . . at South Central . . . they was too scared to kill . . . and they was scared I'd kill them, so, they wrote a bunch of letters on me. And had me put on involuntary PC . . . they wrote letters talkin' about, ". . . they gonna kill me, if they don't move me off the Unit . . . ."

. . . .

SH: Well, they put me on involuntary PC. I begged, pleaded and wrote a grievance and everything . . . threatened to go to the media about all the women guards down there bringing in drugs to them black gang members and stuff. And, what'd they do? They shipped me . . . tore the grievance up . . . shipped me off to Hardeman County . . . and kept me on PC 24 hours and put me on the compound . . . .

. . . .

SH: I had a cell partner . . . . He's 60 . . . 65-year-old, old man. He'd wipe his face with his dirty socks in the morning . . . he's real nasty. So, I turned in a Cell-Change request. Nothing happened on it . . . turned in four more Cell-Change requests. I filed grievances on this matter that's documented. And I kept trying to get a cell change. And they said, "Well, we ain't moving you! Do what you gotta do . . . kill him or whatever!" Now this is what the unit manager said! All right? Well . . . I filed another grievance and wrote a letter the day after I filed a grievance, and sent it to the Warden, explaining the situation, about me needing a cell change. Well, the Warden sent it to Delbert Steed, and told him to take care of it. He wrote me up, for attempting to intimidate an employee with a grievance. He wrote the write-up on May the 16th of 2001. I filed the grievance on May the 15th, 2001. I went to D-Board and was found guilty on the write-up that was clearly where he said in the grievance that I'd already filed a . . . grievance. . . . [H]e wrote me up the old bogus write-up. Which was . . . pissed me off, big time! Because I had a little hope! You know, I . . . I . . . I know I ain't got much hope of ever gettin' out, but I hope I'd get a time-reduction or something like that . . . file for clemency.

. . . .

SH: Accoding [sic] for me to be able to file for clemency, that'd be five years without a write-up. Now, I'd already been four and a half years without a write-up . . . .

. . . .

SH: [A]nd I get to Hardeman County and I get one within two weeks from this asshole. Well, the Unit Manager and them . . . after its over with . . . they finally go ahead and give me a cell-change request on May the something or other . . . and the Unit Manager told me flat out, no uncertain terms . . . "Delbert Steed hates you . . . he doesn't like you . . . ." Well, he's my counselor . . . .

. . . .

SH: The Unit Manager ain't there half the time . . . he never comes into the Pod.

Who am I suppose to go to when I need something done . . . .  Well, I tried to talk to him three or four times.  And he got irritational [sic] . . . cussed me. . . . Tell me, . . . uh.  "You don't smirk at me . . . I'll write you up!  Da . . . da . . . da."  All that shit there!  I said, "Hold up, man!"  I said, "Motherfuck you and a write-up, Bitch!  I ain't never gettin' out of prison as it stands now . . . so, what's a write-up gonna hurt?"  And, that was that on that.  And then, two or three other occasions we had run-ins with each other, where I tried to get him to do something and he didn't wanna do it . . . .  So, here I am with no counselor to go to, other than Steed.  I went to him two or three times . . . .

. . . .

SH: Monday I tried to talk to him, and he told me to ". . . shut up, I don't wanna hear it . . . ."  And basically, it was the same thing.  And I told him then, I said, "Look here!"  I said, "I need you to check this out for me, and let me know what the deal is."  See, I was trying to get some arts and craft stuff in . . . and I'm asking him if he can check and see if they're allowing in-cell arts and crafts to come straight from the company . . . .  And he didn't wanna do anything about it.  And I told him, I said, "Look, man!  I don't wanna file a grievance on the matter.  I wanna resolve it!

. . . .

SH: And he said, "Ah, I'm gonna write you up for attempting to intimidate me!"  He said, " I'm friends with these gangs around here!  They like me!  They love me!" . . . "you ain't nothing!"

. . . .

SH: And all this shit here!  Hell, I'm living in a Unit with five different gangs surrounding me, and he's telling me he's friends with gangs and shit.  And sure as shit today, a bunch of his little gang-member friends come out of the wood-work to help him.  And, like I said, if my knife hadn't broke, there'd been more people dead.

DD: When did you decide . . . that you were gonna take some action against him?

. . . .

SH: Well . . . I'd . . . I had thought about it Monday.  I mean, I'd went and got my knife, and I really thought about gettin' him Monday.  And then, I decided to just fuck it, and leave it alone.

. . . .

SH: Uh . . . and then, today, I started to walk up and say something to him, and one of the little gang members that he talked to a lot there, run up and set down at the table and started talkin' to him.  And I stood over to the side for a few minutes, and he looked at me, and he just shook his head . . . just turned around and faced the other directions [sic].  And I said, "Fuck this!"  And I went to the house, and got my damn knife and packed my property up real quick . . . threw my shit in a box and un-done my TV, and set it over to the side, and went and killed his ass!  It was that plain and simple.

-4-

The defendant then explained that his weapon was more like an ice-pick than a knife and that the handle was made from a magic marker that he had gotten from the Unit Manager's office. He stated that he had the weapon since he arrived at the Hardeman County Facility for his own protection. The defendant also admitted that he intended to kill Steed by stabbing "the most vital organs first . . . the heart and the lung."

The defendant later sent a letter to the District Attorney General acknowledging his culpability in the murder of Steed. In this letter, the defendant expressed that he had no remorse for his actions and that he intended to kill others that day but was unable to because his weapon broke.

Dr. O.C. Smith, the Shelby County Medical Examiner, conducted an autopsy of Steed. As a result of his examination, Dr. Smith concluded that Steed's death was the result of thirty-six (36) stab wounds (ten (10) to the chest, one (1) to the abdomen, fourteen (14) to the back, and eleven (11) to the arm). Of the thirty-six (36) wounds, twelve (12) were lethal in and of themselves. The location of the lethal wounds corroborated the defendant's statement that he was attempting to strike the vital organs of Steed.

*Sentencing Phase Evidence*

The State introduced, per stipulation, three certified judgments against the defendant. The judgments revealed the following:

> (1) Defendant Hugueley was convicted of first degree murder with a sentence of life imposed on August 19, 1986, in Dyer County case number 13344.
> (2) Defendant Hugueley was convicted of first degree murder with a sentence of life imposed on February 13, 1992, in Lauderdale County case number 5564.
> (3) Defendant Hugueley entered a guilty plea to attempt to commit first degree murder and sentenced to twenty-five years on May 21, 1998, in Lauderdale County case number 8448.

Investigator Dunaway testified that the defendant's 1992 guilty plea to attempted first degree murder was the result of the attempted murder of an inmate at Brushy Mountain State Prison. The weapon used by the defendant to commit this offense was "made out of [an] . . . eight inch piece of metal, sharpened on one end with a makeshift handle placed on the other . . . ." The victim in this case "suffered multiple stab wounds, over a dozen."

Dr. O.C. Smith described the weapon used as one that would cause pain "on a living, awake individual." He also stated that the matter of death in the instant case would qualify under the term of "overkill." He explained that the term "overkill" was used in forensic pathology to mean that "there was excessive injury done to the body far in excess of what would be necessary to cause death."

Upon the defendant's direction, no mitigation evidence was presented.[1] In open court, the defendant waived his right to present any mitigating evidence.[2]

At the close of the proof, the jury was instructed on the following statutory aggravating circumstances:

(1) The defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person.
(2) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.
(3) The murder was committed by the defendant while the defendant was in lawful custody.
(4) The murder was committed against a correction employee, who was engaged in the performance of official duties, and the defendant knew or reasonably should have known that such victim was a correction employee engaged in the performance of official duties.

See Tenn. Code Ann. § 39-13-204(i)(2), (5), (8) & (9).

Following submission of the instructions, the jury retired to consider their verdict. After deliberation, the jury found that the State had proven the aggravating circumstances beyond a reasonable doubt. The jury further found that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The jury sentenced the defendant to death for the murder of Steed.

*Procedural History Leading to this Court's Review*

---

[1] Defense counsel introduced the defendant's social history compiled by the defense team, not as evidence, but to show that mitigation research was completed.

[2] One can choose to forego the presentation of mitigation evidence even over the contrary advice of counsel and warnings of the court. See Blystone v. Pennsylvania, 494 U.S. 299 (1990); Silagy v. Peters, 905 F.2d 986, 1008 (7th Cir. 1990). The Supreme Court of the United States does not require a defendant to present mitigating evidence; rather, statements by the Court regarding the ability of a defendant to present such evidence are phrased permissively. See, e.g., Blystone, 494 U.S. at 307 n.5; McClesky v. Kemp, 481 U.S. 279, 305-06 (1987); Skipper v. South Carolina, 476 U.S. 1, 8 (1986); Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982). Indeed, the Eighth Amendment and evolving standards of decency neither require nor demand that an unwilling defendant present an affirmative penalty defense in a capital case. See State v. Smith, 993 S.W.2d 6, 13-14 (Tenn. 1999; see also People v. Bloom, 774 P.2d 698, 718-19 (Cal. 1989); Hamblen v. State, 527 So.2d 800, 804 (Fla. 1988); Wallace v. State, 893 P.2d 504, 510-12 (Okl. Crim. App. 1995). Accordingly, the decision of a *competent* capital defendant not to present mitigating evidence does not deprive the State of its interests in seeing that his sentence was imposed in a constitutionally acceptable manner. See Smith, 993 S.W.2d at 14.

After the sentence of death was imposed, the defendant indicated his desire to remove appointed counsel, waive his motion for new trial, and waive direct appeal of his conviction and sentence of death. Whereupon, the trial court granted the defendant's request, and relieved counsel of further representation of the defendant. However, shortly thereafter, the defendant, proceeding *pro se*, filed a motion to appoint counsel and a motion for new trial. In support thereof, the defendant asserted that he waived his motion for new trial because he misunderstood the law. On October 9, 2003, the trial court granted the defendant's motion and appointed F. Michie Gibson and T. J. Jones to represent the defendant at the motion for new trial and on appeal. A motion for new trial was filed on October 9, 2003.

On December 3, 2003, the trial court denied the defendant's motion for new trial. A notice of appeal was filed by appointed counsel on December 29, 2003. A letter written by the defendant, dated December 18, 2003, was sent to the trial judge indicating the defendant's desire to represent himself on appeal. On January 13, 2004, the trial court, in response to the defendant's letter, conducted a hearing during which the defendant reiterated that he did not wish to appeal his sentence of death. The trial court determined that "any and all waivers heretofore made by the defendant have been knowing, intelligent and voluntary."

On February 19, 2004, the record was filed with the Clerk of this Court and the matter was placed on this Court's April 2004 docket. Although the defendant had knowingly waived his right to direct appeal of his conviction and sentence, the defendant proceeded to file a *pro se* motion with this Court, requesting an extension of time in which to submit his initial brief. This Court denied the motion by order entered March 24, 2004, acknowledging that briefing was not required in matters where a defendant had waived his right to appeal. See State v. Stephen Lynn Hugueley, No. W2004-00057-CCA-R3-DD (Tenn. Crim. App., at Jackson, Mar. 24, 2004) (order). Notwithstanding, this Court, concerned as to the defendant's objectives, provided the defendant the opportunity to withdraw his waiver of appeal and seek full appellate review. Id. On March 29, 2004, the defendant provided this Court with a revocation of his waiver of his right to appellate review and indicated his desire for full appellate review of his conviction and sentence. On May 12, 2004, this Court remanded the matter to the trial court for appointment of counsel. See id. The matter then proceeded in accordance with the Tennessee Rules of Appellate Procedure.

## I. Guilt Phase Issues

The defendant presents three challenges relating to the guilt phase of his trial. All three challenges involve the composition and selection of the jury members.

### A. Individual and Sequestered Voir Dire

Initially, the defendant complains that the trial court erred in denying his motion for individual and sequestered voir dire of the jury panel. He contends that the high amount of publicity in this case warranted individual and sequestered voir dire. Specifically, the defendant argues that he was unable to adequately and sufficiently voir dire the individual prospective jurors relating to their opinions and the information to which they had been exposed.

The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial. State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994); State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). The prevailing practice is to examine jurors collectively. State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002); State v. Oody, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991); State v. Hopper, 695 S.W.2d 530, 539 (Tenn. Crim. App. 1985). "Individual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." Austin, 87 S.W.3d at 471-72 (quoting State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992)). The mere fact that prospective jurors know something about a case at the time of impaneling is not unusual. People do not live in isolation. Indeed, in this age of mass media it is quite likely jurors have some level of pre-trial exposure to the facts and issues involved in a case. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). Mere exposure of jurors to publicity does not automatically constitute constitutional error. Id.; Murphy v. Florida, 421 U.S. 794, 800 (1975). The fact that a prospective juror knows something about a case is not sufficient to invoke individual voir dire, where the trial court takes the necessary steps to ensure that the accused receives a fair trial by a panel of impartial and indifferent jurors. Austin, 87 S.W.3d at 472. The real question in determining a juror's acceptability is whether his exposure is to matters "not so prejudicial as to create a substantial risk that his or her judgment will be affected . . . ." Tenn. R. Crim. P. 24(b)(2). The decision regarding the individual voir dire of prospective jurors remains within the sound discretion of the court, and will not be reversed on appeal absent a finding of "manifest error." Howell, 868 S.W.2d at 247-48.

Prior to trial, the defendant filed a motion requesting individual voir dire for pre-trial publicity. Although not included in the record, it appears that the trial court denied the motion. The motion was not renewed prior to the start of voir dire. The prospective jurors were impaneled in the courtroom and collectively asked whether they had been exposed to potentially prejudicial material. Thirty-nine (39) prospective jurors admitted prior knowledge of the case from various sources, ranging from news media to hearsay statements of acquaintances. The trial court then asked those responding affirmatively to identify the source of the information and whether this knowledge had caused them to form an opinion of the case. If the prospective juror responded that the information had caused them to form an opinion, the trial court then made inquiry as to whether they would need additional proof to change their opinion. If the juror indicated that he or she would, the trial court excused the prospective juror from the venire. The trial court excused twenty-four (24) of the thirty-nine (39) prospective jurors based upon their responses that the prior exposure would influence their decision regarding the defendant's guilt or innocence. Both the prosecution and the defense were permitted to further question the remaining jurors. The defense team requested voir dire of one prospective juror, Barry Watkins, out of the presence of the other jurors. The trial court granted this request. After the questioning of Watkins was completed, defense counsel stated, "I do not see anybody that I believe we need to do an individual hearing about other than Mr. Watkins."

In State v. Porterfield, 746 S.W.2d 441 (Tenn. 1988), our supreme court approved a method of jury selection very similar to that used by the trial judge in this case. In Porterfield, the defense counsel argued that the trial court improperly limited the "questioning of prospective jurors with respect to exposure to pre-trial publicity." Id. at 446. The trial judge had asked the jurors whether

they had heard any inflammatory publicity which they could not set aside. Id. Every prospective juror who indicated they could not base their decision only on the evidence presented at trial was excused. Id. Also, during this questioning, the trial judge was careful to make sure nothing inflammatory or prejudicial was revealed about the defendant. Id. Upon review, our supreme court found no error. Consequently, the ruling in Porterfield stands for the proposition that if no prejudicial information is elicited during voir dire, and if the jurors assert they can disregard the pretrial publicity, there is no error in denying individual voir dire. Id. at 446-47.

In subsequent cases, our supreme court has applied Porterfield to find no reversible error by the trial court in denying individual, sequestered voir dire of prospective jurors when determining exposure to pretrial publicity. See Cazes, 875 S.W.2d at 262; Howell, 868 S.W.2d at 238. In Cazes, where the jurors stated that they could render a verdict based solely on the evidence presented at trial, our supreme court found no error, noting "a trial court's findings of juror impartiality may be overturned only for 'manifest error.'" 875 S.W.2d at 262 (citations omitted). In Howell, sixty-four percent (64%) of the prospective jurors had heard about the case. 868 S.W.2d at 247. The court refused individual voir dire for all prospective jurors, but indicated if a prospective juror remembered the specific content of any pretrial publicity, questions had to be submitted on an individual basis. Those prospective jurors who remembered details of the pretrial publicity indicated they could still be fair and render an impartial verdict. Id. at 248. As a result, our supreme court concluded that the trial court did not abuse its discretion. Id.

In light of the holdings of Porterfield, Cazes, and Howell, we determine that the trial court acted within its discretion in denying individual voir dire. Prospective jurors who indicated they could not be impartial were excused for cause. No prejudicial information was released to the prospective jurors. All the prospective jurors who eventually heard the case indicated they could be fair and render an impartial verdict. Moreover, the defendant had the opportunity to further question prospective jurors and to request the individual, sequestered voir dire of the prospective jurors. Indeed, the defense did seek sequestered voir dire of one prospective juror, which was granted by the trial court. Therefore, defendant's failure to further avail himself of this opportunity cannot be imputed as error of the trial court. Under these circumstances, we cannot conclude that the trial court violated either the spirit or the letter of Porterfield and its progeny.

The defendant has failed to demonstrate that he was not provided a fair trial by a panel of impartial and indifferent jurors. There is no indication that particular questions would have elicited specific information resulting in the removal of any of the jurors that sat on the final panel. Therefore, his argument is without merit.

### B. Batson Challenges

The defendant next argues that his convictions should be reversed because the State purposefully used its peremptory challenges to exclude female and African-American prospective

jurors. [3] The State argues that there was no constitutional violation because the prosecutor provided neutral reasons for its challenges to these jurors.

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violated the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. In Powers v. Ohio, 499 U.S. 400, 415-16 (1991), the Supreme Court upheld the principles of Batson, but eliminated the requirement that the defendant and the wrongfully excluded juror be of the same race in order for there to be an equal protection claim. See also State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992). In J. E. B. v. Alabama, ex rel. T.B., 511 U.S. 127, 130-31 (1994), the Court extended the Batson prohibition to peremptory strikes based on gender.

To invoke the protections of Batson, the defendant must establish a prima facie case that a juror is being challenged on the basis of race or gender. Batson, 476 U.S. at 94; see also Purkett v. Elem, 514 U.S. 765, 767 (1995); State v. Jones, 789 S.W.2d 545, 548 (Tenn. 1990). Once the defendant has presented a prima facie case, the trial court shall require the State to give a race-neutral reason for the challenge. Batson, 476 U.S. at 94; see also Purkett, 514 U.S. at 767. The race or gender neutral explanation need not be persuasive, or even plausible. Purkett 514 U.S. at 768. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id. (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)). If a race or gender neutral explanation is given, the trial court must then determine, given all the circumstances, whether the defendant has established purposeful discrimination. Batson, 476 U.S. at 96-98; see also Purkett, 514 U.S. at 767. Although the trial court must accept a facially race-neutral explanation for purposes of determining whether the proponent has satisfied his burden of production, this does not mean that the trial court is bound to believe the explanation in making its determination. In other words, while the trial court may find that a proffered explanation is race-neutral, the court is not required to find that the proffered explanation was the actual reason for striking the juror. If the court determines that a race or gender based motive was behind the challenge, the juror may not be excluded. Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 903 (Tenn. 1996).

"The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." Id. at 906 The trial court observes the demeanor of both the prospective jurors and counsel and can evaluate credibility. State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994), cert. denied, 516 U.S. 829 (1995). Therefore, specificity in the trial court's factual findings is important because appellate review is limited to facts on the record and the trial court's findings are to be accorded great deference, not set

---

[3] The defendant is a Caucasian male. The record indicates that the defendant has made racially-motivated comments and has a backwards swastika tattooed in the middle of his forehead.

aside unless clearly erroneous.  <u>Woodson</u>, 916 S.W.2d at 906; <u>Smith</u>, 893 S.W.2d at 914.

### 1.  Review of Peremptory Challenges

The State used three (3) of its peremptory challenges to excuse Mr. Hudson, Ms. Gibbs, and Ms. Pirtle.[4]  The record does not indicate the race of these prospective jurors, and the defendant made no objection to the State's exercise of peremptory challenges to these prospective jurors.  No objection can now be raised as to these jurors.  The State also exercised peremptory challenges with regard to Ms. Ferguson, Mr. Woods, Ms. McKinnie, Ms. Heard, and Ms. Pruitt.  Defense counsel objected.

### A.  Ida Ferguson

The trial court announced that the Defendant raised a <u>Batson</u> objection to the State's challenge of prospective juror Ida Ferguson.  No basis for the <u>Batson</u> objection is provided in the record.  In explaining its challenge to Ms. Ferguson, the State relied upon Ms. Ferguson's jury questionnaire, in which she answered that she had "personal, moral or religious beliefs against imposition of the death penalty."  Ms. Ferguson's response in the questionnaire added "the life sentence without parole is adequate, vengeance is mine said the Lord."  The trial court overruled the objection.

### B.  Everette Woods

The trial court announced that the defendant had posed a <u>Batson</u> objection to the State's challenge of prospective juror Everette Woods.  Again, no basis for the <u>Batson</u> objection is provided in the record.  The State, in defending its challenge, relied upon the questionnaire submitted by Mr. Woods.  In the questionnaire, Mr. Woods responded that he had "personal, moral, or religious beliefs against imposition of the death penalty."  He added that "I do not believe in the death penalty."  The defendant responded that Mr. Woods was rehabilitated during the State's argument, stating that he could follow the law of the land and impose the death sentence.  The trial court excused Mr. Woods.

### C.  Phyllis McKinnie

The trial court announced that the defendant objected to the State's challenge to prospective juror Phyllis McKinnie.  The defendant argued that Ms. McKinnie was the sixth African-American challenged by the State.  In support of its challenge, the State relied upon Ms. McKinnie's juror questionnaire.  Ms. McKinnie affirmatively responded that she held "personal, moral, or religious beliefs against the imposition of the death penalty."  She explained, "I just don't want to be a part

---

[4] Defendant Hugueley asserts that these prospective jurors were also African-American.  He correctly states that the State used only eight (8) of its peremptory challenges.  Accordingly, he contends that all of the State's peremptory challenges were exercised against African-Americans.

of putting any person to death because it could turn out to be an innocent person after you have put him or her to death." The trial court found the State's explanation race-neutral and overruled the objection.

### D. Willie Heard

A peremptory challenge was exercised by the State against prospective juror Willie Heard. The defendant objected, stating that Ms. Heard was the seventh African-American and the sixth female struck by the State. The State explained that Ms. Heard had responded in her jury questionnaire that she had "personal, moral, or religious beliefs against the imposition of the death penalty." Ms. Heard explained, "Don't like it, but I can't stop it." The trial court found the State's explanation to be race-neutral. The trial court did admonish that "you might be careful about rehabilitating. The Court will look at it a little closer next time."

### E. Helen Pruitt

A final objection was made to the State's peremptory challenge to prospective juror Helen Pruitt. The defendant complained that this was the eighth African-American and the seventh female challenged by the State. The State replied that "[w]e still have four on there." Furthermore, the State explained that Ms. Pruitt was "teary-eyed" when being questioned by the State. She was also shaking her head no. The trial court found that the State's motive was not racially motivated.

Before beginning our review of the individual challenges, we note that the trial court failed to specifically articulate its reasons for overruling the objections on the record. While specificity in the trial court's findings is preferred as it aids review on appeal, this Court has previously upheld a trial court's acceptance of a prosecutor's race-neutral reasons absent detailed findings of its own. See State v. Carroll, 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000); State v. Howard Jefferson Atkins, No. W2001-02427-CCA-R3-CD, 2003 WL 21339263, at *5 (Tenn. Crim. App. at Jackson, May 16, 2003), perm. app. denied (Tenn. Oct. 6, 2003).

All objected to peremptory challenges made by the State were against five (5) African-Americans, four (4) of whom were female. Therefore, we determine that the defendant made a prima facie showing that the prosecutor had exercised peremptory challenges on the basis of race and/or gender.[5] See Purkett, 514 U.S. at 767-70.

We next look to the State's explanation for exclusion of the venire members in question. This step "does not demand an explanation that is persuasive, or even plausible." Purkett, 514 U.S. at 768. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered

---

[5]The trial court failed to explicitly find that the defendant had established a prima facie showing of discrimination. Notwithstanding, the court would not have required the State's race-neutral explanation if such a showing was absent. See Carroll, 34 S.W.3d at 320 (citing Woodson, 916 S.W.2d at 905).

will be deemed race neutral." Id. (quoting Hernandez, 500 U.S. at 360). Four (4) of the five (5) prospective jurors were challenged due to their responses on the jury questionnaires relating to their opinions of the death penalty. Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, a juror's reservations may constitute a reasonable explanation for the exercise of a peremptory strike. See generally, State v. Keen, 31 S.W.3d 196, 228-29 (Tenn. 2000); Smith, 893 S.W.2d at 914. As to the remaining juror, the State explained that Ms. Pruitt's demeanor during questioning prompted the challenge. "Many of the judgments made by counsel in picking a jury are purely intuitive and based upon inarticulable factors." Carroll, 34 S.W.3d at 320 (quoting United States v. Bentley-Smith, 2 F.3d 1368, 1374 (5th Cir. 1993)). Thus, subjective considerations are permitted because of the inherent nature of peremptory challenges. Id. These considerations are carefully scrutinized and are conditioned upon the understanding that the ultimate conclusion will turn on an evaluation of the credibility of counsel's explanation. Id. With these considerations, we conclude that the State's use of a peremptory challenge against Ms. Pruitt was sufficiently race-neutral to dispel any indicia of purposeful discrimination.

Although the trial court failed to indicate whether the challenges against the four (4) female jurors were gender neutral, we can infer from the record that the State's challenges were not gender based. In this regard, we acknowledge that the trial court has discretion to consider whether similarly-situated members of another race were seated on the jury or whether a race or gender neutral explanation is so implausible or fantastic that it renders the explanation pretextual. The trial court may also consider the demeanor of the attorney who exercises the challenge which is often the best evidence of the credibility of his proffered explanations. See Hernandez, 500 U.S. at 365. The jury ultimately empaneled consisted of at least six (6) female jurors. At the time the final jury was empaneled, the State had seven (7) of its peremptory challenges remaining.

We now turn to the third step in the Batson analysis. Here, the persuasiveness of the explanation becomes relevant, and the trial court must determine whether the opponent of the peremptory challenge has carried the burden of proving purposeful discrimination. Purkett, 514 U.S. at 768. At this stage, outrageous, fantastic, and implausible explanations may be found to be pretextual for purposeful discrimination. See id. Thus, the validity of the prosecutor's race-neutral explanations rests in part upon the trial court's assessment of the prosecutor's credibility. Miller-El v. Cockrell, 537 U.S. 322, 339 (2003). This assessment is entitled to great deference and will not be overturned unless clearly erroneous. Id. Again, though the trial court did not provide detailed findings as to the reason of the challenges, the record does not indicate any evidence of purposeful discrimination. Thus, we conclude that the trial court did not abuse its discretion by overruling the defendant's Batson objections and defendant is not entitled to relief on this issue.

### C. Barry Watkins

Prospective Juror Barry Watkins was questioned by the trial court as to whether he had been exposed to any pretrial publicity regarding this case. Mr. Watkins responded that his brother was an employee at the Hardeman County Correctional Facility. He further indicated that he had not

formed an opinion as to the defendant's guilt. In response to questioning by the prosecution, Mr. Watkins again stated that his brother was an employee at the correctional facility. Mr. Watkins stated that he could impose a sentence of death. Defense counsel later requested individual voir dire of Mr. Watkins, which was granted by the trial court. In chambers, Mr. Watkins was extensively questioned as to whether he had a prior felony conviction and as to whether the fact that his brother was one of the prosecution's witnesses had any bearing on his ability to sit on this case. Mr. Watkins testified that he was not a convicted felon. He explained that twenty-seven years (27) ago he had been arrested for a robbery, but this charge was later dismissed when the true perpetrator was apprehended. Additionally, Mr. Watkins stated that his brother did not inform him of any facts of the case. The only information his brother had provided him was that he was going to be a witness for the State. Mr. Watkins explained that he would not give his brother's testimony any more weight than the testimony of any other witness. The defendant moved to strike Mr. Watkins because of his relationship with a State witness. The trial court overruled the motion. The defense later used one of its peremptory challenges to remove Mr. Watkins from the venire. The defendant now complains that the trial court's refusal to strike Mr. Watkins for cause was error.

The defendant begins his argument by contesting the veracity of Mr. Watkins' responses. Specifically, he contends that Mr. Watkins misled the court about the extent of his knowledge and his opinions in this case. Additionally, he asserts that Mr. Watkins stated that he was not a convicted felon, "when in fact he was a convicted felon." These allegations are the defendant's beliefs. There is nothing in the record to support these allegations made by the defendant. These allegations are without merit.

According to Mr. Watkin's testimony, the fact that his half-brother was a witness in the case would neither influence his decision nor hinder his ability to follow the law as instructed by the trial court. "The relationship of a juror to a witness in the trial does not per se disqualify the juror." Jones v. State, 320 S.W.2d 645, 648-49 (Ark. 1959). In addition, the decision whether or not to excuse a prospective juror for cause rests within the discretion of the trial court and will not be reversed absent a showing that the court abused its discretion.

Before a defendant can "complain that a trial court abused its discretion in failing to remove a potential juror for cause, the defendant must have exercised a peremptory challenge to remove the potential juror, must have exhausted all peremptory challenges, and must have been forced to accept an incompetent juror." State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (citing Howell, 868 S.W.2d at 248). In the case at bar, the record reflects that the prospective juror in question was excused by peremptory challenge made by the defendant. The record further reflects that the defendant exhausted all of his peremptory challenges. Notwithstanding the satisfaction of the first two requirements, the defendant has failed to establish that an incompetent juror was forced upon him. Howell, 868 S.W.2d at 248. Although it appears from the record that three of the remaining jurors did indicate that they had some knowledge of the case, none of these jurors indicated that this knowledge had caused them to form a preconceived opinion of the defendant's guilt. Moreover, the defendant has failed to establish that the jury that actually heard the case was not fair and impartial. This claim is without merit.

-14-

## II.  Penalty Phase Issues

### A. Indictment Fails to Charge Capital Offense

On appeal, the defendant asserts that the "Tennessee statutory sentencing scheme under which the State seeks to subject this Defendant to the penalties of death or life imprisonment without possibility of parole is unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, as well as Article I, Sections 8, 9, 16, and 17, Article II, Section 2, and Article XI, Section 8 of the Tennessee Constitution." Essentially, he argues that Tennessee's sentencing scheme fails to provide that aggravating circumstances be charged in the indictment before elevating the first degree murder penalty from life in prison to a sentence of death. In support of his argument, the defendant relies upon the decisions of the United States Supreme Court in Jones v. United States, 526 U.S. 227 (1999); Apprendi v. New Jersey, 530 U.S. 466 (2000); and Ring v. Arizona, 536 U.S. 584 (2002).

The defendant's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Specifically, the defendant complains that the indictment returned by the grand jury charges non-capital, first degree murder because the grand jury did not find any capital aggravating circumstances. Thus, the defendant alleges that to satisfy the requirements of Apprendi, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder.  This argument has recently been rejected by our supreme court in State v. Holton, 126 S.W.3d 845 (Tenn. 2004); see also State v. Berry, 141 S.W.3d 549, 558-62 (Tenn. 2004). In Holton, our supreme court explained that "Apprendi applies only to enhancement factors used to impose a sentence above the statutory maximum" and that "the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly . . . ." Holton, 126 S.W.3d at 863 (citing State v. Dellinger, 9 S.W.3d 458, 466-67 (Tenn. 2002)); see also  State v. Odom, 137 S.W.3d 572, 590 (Tenn. 2004). The court further emphasized that "Tennessee's capital sentencing procedures require that a jury, not a judge, make the findings regarding the presence of aggravating circumstances and that the findings must be made beyond a reasonable doubt." Odom, 137 S.W.3d at 590-91 (citing Holton, 126 S.W.3d at 864; see also Tenn. Code Ann. § 39-13-204(f)(1)(2003). The defendant is not entitled to relief on this issue.

### B.  Constitutionality of Proportionality Review

Next, the defendant complains that the statutorily mandated proportionality review is constitutionally inadequate due to the failure to promulgate meaningful standards by which to address the issue.  Our supreme court has, on numerous occasions, upheld the appellate review process in death penalty cases.  See State v. Reid, 91 S.W.3d 247, 313 (Tenn. 2002);  Cazes, 875 S.W.2d at 270-71; Harris, 839 S.W.2d at 77.  Moreover, although comparative proportionality review acts as an additional safeguard against arbitrary or capricious sentencing, our supreme court has recognized that it is not constitutionally required. State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), cert. denied, 523 U.S. 1083 (1998). Accordingly, the defendant is not entitled to relief as to this issue.

**III. Review Pursuant to Tennessee Code Annotated Section 39-13-206**

For a reviewing court to affirm the imposition of a death sentence, Tennessee Code Annotated section 39-13-206(c)(1) requires a determination that:

(1) the sentence was not imposed in an arbitrary fashion;

(2) the evidence supports the jury's finding of statutory aggravating circumstance(s);

(3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and

(4) the sentence is not excessive or disproportionate to the penalty imposed in similar cases.

Tenn. Code Ann. § 39-13-206(c)(1). The sentencing phase in the present case was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure. Therefore, we conclude that the sentence of death was not imposed in an arbitrary fashion.

*Sufficiency of Aggravating Circumstances*

The State has the burden of proving beyond a reasonable doubt that a statutory aggravating circumstance exists. Tenn. Code Ann. § 39-13-204(i). In determining whether the evidence supporting the existence of an aggravating circumstance is sufficient, "the proper inquiry for the appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." State v. Carpenter, 69 S.W.3d 568, 574 (Tenn. Crim. App. 2001) (citing State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000)).

*Tennessee Code Annotated section 39-13-204(i)(2)*

In the present case, the State introduced, per stipulation, three certified judgments against the defendant. The judgments revealed the following:

(1) Defendant Hugueley was convicted of first degree murder with a sentence of life imposed on August 19, 1986, in Dyer County case number 13344.

(2) Defendant Hugueley was convicted of first degree murder with a sentence of life imposed on February 13, 1992, in Lauderdale County case number 5564.

(3) Defendant Hugueley entered a guilty plea to attempt to commit first degree murder and sentenced to twenty-five years on May 21, 1998, in Lauderdale County case number 8448.

There is no question that the offenses of first degree murder and attempt to commit first degree

murder are crimes whose statutory elements involve the use of violence to the person. The evidence was sufficient to support the jury's finding of the prior violent felony aggravator. Accordingly, there is no error in its application in this case.

*Tennessee Code Annotated section 39-13-204(i)(5)*

The jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See Tenn. Code Ann. § 39-13-204(i)(5).

In State v. Odom, our supreme court reviewed the aggravating circumstance found in Tennessee Code Annotated section 39-13-204(i)(5) and noted that "torture" had been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." 928 S.W.2d 18, 26 (Tenn. 1996) (citing State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). Our supreme court also held that when the legislature added the words "or serious physical abuse," to the language, it intended "serious physical abuse" to be distinct from "torture." See id; see also State v. Keen, 31 S.W.3d 196, 206 (Tenn. 2000). In examining the "serious physical abuse" element, the supreme court determined that the word "serious" referred to the degree of abuse; that the abuse must be physical, as opposed to mental; and that "abuse" is properly defined as an "excessive" act, or one which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use." Id. (citing Black's Law Dictionary 11 (6th ed. 1990)).

Applying this definition to the facts in this case, we conclude that evidence establishing "serious physical abuse" was proven beyond a reasonable doubt. Steed was stabbed a total of thirty-six (36) times. Ten (10) of the wounds were to the chest, one (1) to the abdomen, fourteen (14) to the back, and eleven (11) to the arm. Of the thirty-six (36) wounds, twelve (12) of the wounds were lethal in and of themselves. The location of the lethal wounds were consistent with the defendant's statement that he was attempting to strike the vital organs of Steed. The multiple stabbings to the body of Steed establish "serious physical abuse" as contemplated by our legislature, and support the jury's finding of the aggravating circumstance listed in Tennessee Code section 39-13-204(i)(5).

*Tennessee Code Annotated section 39-13-204(i)(8), (9)*

It is uncontested that the murder of Steed was committed while the defendant was in lawful custody and that the victim was a correction employee engaged in the performance of his official duties. See Tenn. Code Ann. § 39-13-204(i)(8) & (9). The proof is uncontroverted that the defendant was and is still serving two (2) life sentences at the time he brutally murdered Steed. It is also uncontroverted that the defendant knew that Steed was a correction counselor and was acting in such capacity on the date of the murder. Viewed in the light most favorable to the State, we

-17-

conclude that a rational trier of fact could have found the existence of these two (2) aggravating circumstances beyond a reasonable doubt.

*Proportionality*

This Court is required to consider whether the defendant's sentence of death is disproportionate to the penalty imposed in similar cases. Tenn. Code Ann. § 39-13-206(c)(1)(D); State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001); State v. Bland, 958 S.W.2d at 651, 661-74 (Tenn. 1997). The purpose of comparative proportionality review is to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Henderson, 24 S.W.3d 307, 315 (Tenn. 2000) (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate." Bland, 958 S.W.2d at 665 (citations omitted). In order to determine whether a case is so "plainly lacking in circumstances," the appellate court may take advantage of the State's Rule 12 database, traditional methods of legal research, appellate court opinions, and the experienced judgment and institutional knowledge of the court members. Godsey, 60 S.W.3d at 785. Additionally, the appellate courts have consistently directed both the State and the defendant to fully brief the issue in each case and to discuss cases and factors relevant to the comparative proportionality inquiry. Id. (citing Bland, 958 S.W.2d at 667). Thus, the reviewing appellate court utilizes all of the tools at its disposal to conduct a thorough and complete comparative proportionality review in every case.

In conducting our proportionality review, this Court must compare the present case with cases involving similar defendants and similar crimes. State v. Stout, 46 S.W.3d 689, 706 (Tenn. 2001); Terry v. State, 46 S.W.3d 147, 163 (Tenn. 2001) (citations omitted). We select only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000); see also Godsey, 60 S.W.3d at 783. We begin with the presumption that the sentence of death is proportionate with the crime of first degree murder. Terry, 46 S.W.3d at 163. This presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" Id. (quoting Gregg v. Georgia, 428 U.S. 153, 206 (1976)) (citations omitted).

Applying this approach, this Court, in comparing this case to other cases in which the defendants were convicted of the same or similar crimes, looks at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. Id. Regarding the circumstances of the crime itself, numerous factors are considered including: (1) the means of death, (2) the manner of death, (3) the motivation for the killing, (4) the place of death, (5) the victim's age, physical condition, and psychological condition, (6) the absence or presence of provocation, (7) the absence or presence of premeditation, (8) the absence or presence of

justification, and (9) the injury to and effect on non-decedent victims. Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164; Bland, 958 S.W.2d at 667. Contemplated within the review are numerous factors regarding the defendant, including: (1) prior criminal record, (2) age, race, and gender, (3) mental, emotional, and physical condition, (4) role in the murder, (5) cooperation with authorities, (6) level of remorse, (7) knowledge of the victim's helplessness, and (8) potential for rehabilitation. Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164.

In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." Terry, 46 S.W.3d at 164. Thus, our function is not to limit our comparison to those cases where a death sentence "is perfectly symmetrical," but rather, our objective is only to "identify and to invalidate the aberrant death sentence." Terry, 46 S.W.3d at 164 (quoting Bland, 958 S.W.2d at 665).

The circumstances surrounding the murder in light of the relevant and comparative factors reveal that the defendant was an inmate serving two life sentences at the Hardeman County Correctional Facility. On January 17, 2002, the defendant observed correction counselor Steed enter F Pod and sit at a table in the day room. Recalling prior conflicts with Steed, the defendant returned to his cell, obtained a handmade weapon, and returned to the day room area. The defendant then approached Steed and stabbed him from behind. Despite orders to stop his actions, the defendant continued to thrust the handmade weapon into Steed, a total of thirty-six (36) times, stopping only when the crudely- fashioned weapon broke off in his victim's back. Later, the defendant stated that he intended to kill Steed and had purposefully aimed for his vital organs. He added that, had his weapon not broken off in Steed's back, he would have killed a lot more people that day. The defendant further stated that he has no remorse for his actions. At trial, the defendant took the stand in his own defense and admitted to killing Steed. The defendant waived his right to present any mitigation evidence.

The defendant was previously convicted of the first degree murder of his mother in 1986 for which he received a sentence of life imprisonment. In 1992, he was again convicted of first degree murder; a fellow inmate was the victim. Finally, in 1998, the defendant pled guilty to attempt to commit first degree murder of another inmate. The weapon used in the 1998 offense bore similar characteristics to the one used to murder Steed.

While no two capital cases and no two capital defendants are alike, we have reviewed the circumstances of the present case with similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases. The death penalty has been upheld in a case very similar to the instant case. In State v. Taylor, the defendant repeatedly stabbed a correction officer with a prison-made knife. 771 S.W.2d 387, 390 (Tenn. 1989). The defendant believed that he had been treated unfairly by the officer. Id. As in the present case, pleas were made of the defendant to stop his attack on the officer. Id. However, the defendant continued to hold the officer down and continued to stab him, despite the protests of other

inmates. Id. The defendant warned off would be rescuers by brandishing the weapon. Id. The officer died forty (40) minutes after the attack at the prison infirmary. Id. Unlike the present offense, however, the defendant refused to sign a confession and presented evidence as to his history of mental illness or disease. Id.

The sentence of death has been upheld where a defendant has killed a law enforcement officer engaged in the performance of his official duties. See, e.g., State v. Henderson, 24 S.W.3d 307 (Tenn. 2000) (upholding death sentence where defendant shot deputy in back of head during escape from dentist office); Taylor, 771 S.W.2d at 387 (affirming death sentence where defendant killed prison guard during escape attempt); State v. Workman, 667 S.W.2d 44 (Tenn. 1984) (upholding death sentence where defendant shot and killed police officer following robbery of fast food restaurant). The sentence of death has also been upheld where a defendant has been in lawful custody. See, e.g., Henderson, 24 S.W.3d at 307 (affirming death sentence where defendant shot and killed deputy during escape attempt); Taylor, 771 S.W.2d at 387 (upholding death sentence where defendant stabbed guard at prison where defendant was inmate); State v. Sutton, 761 S.W.2d 763 (Tenn. 1988) (affirming death sentence where defendant killed fellow inmate).

The defendant has two prior convictions for first degree murder and one prior conviction for attempted first degree murder. Two of these offenses also occurred while he was incarcerated within the Tennessee Department of Correction. The death sentence has been upheld based on the sole aggravating circumstance of a prior violent felony conviction. Tenn. Code Ann. § 39-13-204(i)(2). See, e.g., State v. McKinney, 74 S.W.3d 291 (Tenn. 2002) (upholding death sentence based on prior conviction for aggravated robbery as adult and aggravated assault as juvenile); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (affirming death sentence based on prior convictions for attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175, 183 (Tenn. 2000) (affirming sentence based on prior convictions for assault to commit voluntary manslaughter and manslaughter); State v. Smith, 993 S.W.2d 6 (Tenn. 1999) (approving sentence based on prior convictions for robbery and first degree murder); State v. Boyd, 959 S.W.2d 557 (Tenn. 1998) (affirming sentence based on prior conviction for second degree murder); State v. Adkins, 725 S.W.2d 660 (Tenn. 1987) (upholding sentence based on prior conviction for aggravated assault). The prior violent felony factor is an aggravating circumstance that this Court has described as "more qualitatively persuasive and objectively reliable than others". McKinney, 74 S.W.3d at 313; Howell, 868 S.W.2d at 261.

Finally, we acknowledge that the death penalty has been upheld in cases where the same or similar aggravating circumstances were found to outweigh any mitigating circumstances. See e.g., State v. Hall, 976 S.W.2d 121 (Tenn. 1998) (upholding death sentence based upon aggravating factors of Tennessee Code Annotated section 39-13-204(i)(2), (5), (6), (7), and (8)); Taylor, 771 S.W.2d at 387 (upholding death sentence based upon Tennessee Code Annotated section 39-13-204(i)(2), (5), (8), and (9)); Sutton, 761 S.W.2d at 763 (upholding death sentence based upon Tennessee Code Annotated section 39-13-204(i)(2), (5), and (8)); State v. Hartman, 703 S.W.2d 106 (Tenn. 1985) (upholding death sentence based upon Tennessee Code Annotated section 39-13-

204(i)(5), (6), and (8)).

Our review and consideration of the record and case law, reveals that the sentence of death imposed upon the defendant is proportionate to the penalty imposed in similar cases. In addition, the sentence of death was not imposed arbitrarily. The evidence supports the jury's finding of the statutory aggravators found in Tennessee Code Annotated section 39-13-204(i)(2), (5), (8), and (9), and the jury's determination that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Therefore, the sentence of death was neither excessive, disproportionate, or arbitrary.

## X. Conclusion

Having fully reviewed the record and the applicable authority, we affirm the defendant's conviction of first degree murder. Additionally, in accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1), and the principles adopted in prior decisions of the Tennessee Supreme Court, we conclude that the evidence supports the jury's finding of the statutory aggravating circumstances involved in this case, and that the jury's finding of aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Finally, a comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the sentence of death imposed by the trial court.

_____

J.C. MCLIN, JUDGE